## Hare *v.* The State.

Where a person who was not a sworn officer, was permitted to go into the jury room after the jury had retired to make up their verdict, in a capital case, and to have charge of them in the absence of the bailiff, it was held a sufficient ground for a new trial.

The act of the legislature of 1836 which takes away challenges to the array, except in capital cases, for partiality or corruption, &c. in the officer summoning the jury on the special *venire facias,* and further enacts that no regular *venire facias* shall be quashed for any cause, does not impair the right of jury trial.

The plea of former trial for the same offence must allege that the prisoner was either acquitted, or that he was convicted, or the plea may be rejected as a nullity.

ERROR from the Circuit Court of the county of Hinds.

At the May term of said court, 1839, William Hare, the plaintiff in error, was tried and convicted of the murder of Robert Sharp.  A motion was made for a new trial, by the prisoner.

The motion was supported by affidavits, which disclosed these facts.  When the case was submitted to the jury, they were placed in charge of a sworn officer, who took them to a hotel in the village of Raymond, at which there were many guests, and there placed them in a room which did not admit of being fastened, except on the outside.  After they had been there some time, how long was not stated, a man by the name of Woodley went into the room unnoticed by the bailiff.  That whilst he, the bailiff, withdrew to obtain water for the jury, he left them under the charge of Woodley, that he was absent seven or eight minutes, and that he left the door unfastened.  It was further proved that Woodley was not a deputy sheriff, nor was he sworn to take charge of the jury.  How long he continued in the room with them, did not appear.  By the bill of exceptions it appeared that the motion was made because Woodley was in the room with the jury, and conversed with them on the subject of the prisoner's guilt, and to establish this, the affidavit of one of the jurors was offered, which the court below rejected, and although the affidavit had a place designated in the bill of exceptions, yet by some omission it was not copied.

[Hare *v.* The State.]

Before the indictment was found, or the grand jury were sworn, the counsel for the prisoner filed a plea, challenging the array of the panel, on the ground, that the same was not drawn at any regular term of the circuit court, or otherwise in pursuance of the statute. The court refused to receive this plea.

The prisoner also tendered a plea, setting out in substance that he had "before been arraigned and tried for the same offence, which was charged in the bill of indictment." This plea was likewise rejected, and the opinion of the court excepted to.

The following errors were assigned by defendant's counsel, in the proceedings of the court below.

1. The refusal of the court to receive the plea of the defendant challenging and objecting to the array of the panel, for the reason that they were not drawn at the preceding regular term of the court, and recorded for the instruction of the prisoner, according to statute.

2. That there was no regular writ of *venire facias* upon which to bring in the panel.

3. That the writ of *venire facias* whereon the said panel was brought into court, was issued without authority, and was therefore null and void.

Hutchinson, for the appellant.

The first point to be considered is, whether there was a lawful grand jury. The first assignment brings into review the array of the panel, the *venire facias*, service, and return, and the rejection of the plea to the array. Indeed the plea itself presents the prominent objection. It was offered when the persons selected for a grand jury were about to be sworn. It is stated that the sheriff and clerk, on the 18th of March, 1839, which will be judicially recognised as a day of the recess between the fall and spring terms of the circuit court, drew a number of persons to serve as jurors at the then next term; and the clerk issued a written command to the sheriff to summon them accordingly. That they were freeholders or householders of the county, or were drawn out of the box *one* or *two*, or that the names drawn were registered, does not appear.

It is surely no vain assumption that a grand jury is an essential

auxiliary of the court of oyer and terminer and jail delivery, and that without its preliminary action a prosecution and conviction for murder could not be sustained.   The constituent elements of the grand inquest, as well as of that of trial by jury, were, by our national and state constitutions, engrafted upon our civil polity; and, though the forms and modes of these institutions, owing to differences in our condition, habits, and circumstances, differ from those of the nation from whom we derived them, the *substance of them must be preserved.* It cannot be *too* often or too urgently repeated, that they are the foundation pillars of that noble fabric of civil liberty which was reared by the Saxon race, and which each successive generation of that race has delighted to beautify and adorn.

But what are those constituent elements thus planted on constitutional foundations, and that must be preserved?   There must be an authoritative and responsible source from which the panel is to emanate, each one on the array must be a freeman at least in the civil division over which the court is to preside, and the inquest is to be taken; the panel must be registered or so published previously, as that those who are suitors, or to be tried, can have opportunity to make up knowingly, challenges to the array or polls.   3 Blackstone's Com. 355.   6 Bacon, 523, 524.

In England, the sheriff arrayed the panel, and hence the challenge allowed to the array for his neglect, partiality or corruption. 6 Bacon, 551, 552.   1 Chit. C. L. 536, 537.   Here it is essential to the existence of the grand inquest that some officer, commission or tribunal, should be designated and empowered to select the jurors to be summoned.   The act of 1830, Reprint 304, gave a sure, safe and perfect mode of originating the panel; and adjudications of this court had scrupulously enforced its provisions.   The freeholders and householders of the county were to be procured from the assessment rolls and deposited in a box.   Then at the court preceding that to which the *venire facias* was to issue, the sheriff and clerk in presence of the judge in open court, were to draw the required number of names, rejecting the removed and ineligible.   The panel thus drawn, could not be a shuffled one. The public eye was open upon its inception.   On this the *venire facias* issued, and the panel was registered for inspection.   If the

circuit court failed to sit, the sheriff and clerk repaired to the pro-
bate court, and the second-box was opened, and so the *modus op-
erandi* excluded the probability of abuse. But the act of 1836
abrogated the challenge to the array and forbid a *venire fa-
cias* from being quashed for any cause whatever, in any court.
Reprint, 578. Let us carry this stolid act into operation. No
challenge to the array is to be had, and no *venire facias* to be
quashed. What then? Where are we to go for the panel? To the
act of 1830? We are not constrained to do so, because it is a dead
letter. If we invoke it as a rule of action, no violation of its pro-
visions, however monstrous, can be noticed. If a sheriff should
return a panel of free negroes and mulattoes as good and lawful
men, the judge in his obedience to the act of 1836, would make
up his grand jury out of them. Would he reject a plea-to the ar-
ray? He could not. Would he quash the *venire?* Thus then
it is we are putting our fellow men upon trials of life and death,
under a statute that gives us no panel out of which to form a grand
jury, or on which to build petit juries for the trials of issues of
traverse and of civil controversies.

Again, another element of the grand inquest to be preserved as
we would sustain the institution itself, is that the jurors should
have at least the qualification of being *freemen,* 6 Bacon, 524.
The act of '30 requires freeholders or householders who are free
white citizens. But if this requisition be disregarded, under the
latter act, it is no vice. If the sheriff were to return a panel of
young men, or such as were neither householders nor freeholders,
a grand jury could be selected out of them—and under the latter
act it would be quite sufficient. Here those on the panel are call-
ed *persons.*

So, too, it is necessary that the panel should be of citizens of
the county, 6 Bacon, 559. But as the challenge to the array no
longer exists, and as no *venire facias* is to be vacated for any
cause, a panel from Rankin or Warren would have answered to
have passed on the indictment in this case, as well as if from
Hinds. There was nothing prior to the plea to the array to show
from what county those *persons* came.

Abuses at each step in the application of the statute in review
multiply and aggravate. Our constitutions, in bringing from

Britain the institution of grand jury, assuredly contemplated an *impartial inquest.* But allow it possible, or even probable, that in some county there may be some temporary excitement, or some undue and formidable conspiracy, and that the sheriff, or whoever may choose to make a panel—(for the act of '36 appoints no person or mode for its emanation,)—should be very much prejudiced, or somewhat base, and should cull out a trained band to his own notion—your circuit judge is obliged to submit to it. He is constrained to elect his grand inquest out of such material. These illustrations could be readily increased.

There is still another important consideration. It was a portion of the British scheme of grand and petit juries, that the panel should be arrayed and returned "weeks and months before the jurors were to appear," and for the very important reason and motive that the suitors and accused should have inspection of the names, that partialities, corruptions, affinities, and the like, might be ascertained—and thus the trial, through the grand and petit juries, should be kept pure and sacredly devoted to the administration of public justice. But what is the practice under the late act? It is to make the list at any time—in any manner—no one knows or can know whether even the clerk and sheriff co-operate. In the present instance, the list was made in March for May, instead of being drawn at the preceding term, and of being enrolled according to the act of 1830. Instances have occurred where the judge gave an oral order after taking his seat, and a jury was got for him in an hour. Is this to be borne? Is it not plain that with such flagrant violations of the act of 1830, which is really the law in force, the institutions of grand jury and jury-trial will sink into the most shameless abuses, the extremest contempt, and become too mean or too hurtful to be preserved? If you enforce the act of '36, you are obliged to consider the act of 1830 as suspended and inoperative. You cannot enforce the former without the power to declare infractions of it illegal and void; and that you cannot do, unless you have the power to entertain a challenge to the array and to substantial defects in the *venire facias.* But as it has been shown that an enforcement of the latter act necessarily involves a subversion of the constituent and essential elements of the grand inquest and trial by jury, as secured to us by

the fundamental law, this court is constrained to declare it uncon-stitutional and void.  And this being done, it will be plain that the panel was illegal, the *venire facias* void, the grand jury unlawful, and that the indictment in this case must fall.

Challenge to the array may be made by the prisoner before the finding of the indictment; and the proper time is between the ap-pearance and swearing of the grand jury.  So it was made here. 1 Chitty's C. L. 309, 544, 545; 1 Burr's Trial, 38—; Ross *v.* State, 1 Blackford, 390; Hudson *v.* State, 1 Blackford, 318; Common-wealth *v.* Clark, 2 Brown, 323; People *v.* Jewett, 3 Wend. 314; Commonwealth *v.* Smith, 9 Mas. 109; McClure *v.* State, 1 Yerg. 206; Commonwealth *v.* Knapp, 10 Pick. 477; Hooker *v.* State, 4 Ohio, 450; Gardner *v.* Turner, 9 John. 261; Pringle *v.* Huse, 1 Cowen, 435, 436, n. 1; Commonwealth *v.* Leppard, 6 Sarg. & R. 395; Crane *v.* Dygett, 4 Wend. 675.

II. The plea of the former trial, &c., ought not to have been rejected.

III. A new trial ought to have been granted.  *After the jury* retired under charge of a sworn officer, they, according to his oath ought to have been kept together in some convenient place, (sepa-rated from the rest of the world,) without meat, drink, or fire, candles and water excepted, suffered to speak to no one, nor to the officer, nor he to them, unless to ask them if they were agreed, without leave of the court.  They were conducted to a room in a tavern, accessible.  The door for a period left open, and they were put under the charge of one not an officer or sworn.  He spoke to them.  If these deviations are to be allowed, any thing may be. King *v.* Mosely, &c. 18 Eng. C. & R. 115; Cochrane *v.* Street, 1 Wash. 79—top 103; Howle *v.* Dunn, 1 Leigh, *455*; Hale *v.* Cove, 1 Strange, 642; Metcalf *v.* Dean, Cro. Eliz. 189, 411; Blair *v.* Chambers, 1 Sarg. & Rawle, 169; People *v.* Douglass, 4 Cow. 26; Brant *v.* Fowler, 7 Cowen, 562.

Foote on the same side.

Attorney General for the state.

Mr. Chief Justice Sharkey delivered the opinion of the court.

Whilst the law is rigidly vigilant in guarding and preserving the purity of jury trials, yet it will not for light or trivial causes,

impugn the integrity of juries, or question the solemnity and impartiality of verdicts. But if the verdict be given under circumstances which might conduce to an improper influence, or the natural tendency of which might be to produce bias or corruption, it cannot then be said to be above suspicion; and if it be not, it must fall short of that perfection which the law requires, and which under a more guarded administration, it is capable of producing. It is not necessary that any attempt should be made to bias the minds of the jurors, or that any pernicious influence should be exerted. The door to tampering is to be closed; this is the only security; for if it be left open, it may be predicted with certainty, that the evil consequences will fall some where.

This question has received repeated adjudications, and it will be sufficient for me to refer to some of the decided cases, in which the reasoning is, to my mind conclusive, and the rule clearly defined.

In the case of the Commonwealth *v.* Roby, 12 Pickering, 496, the question was very fully considered, and it is made so clear that I shall give the language of the Chief Justice, somewhat at length. In giving the general rule he says, "it is a well settled rule of practice incident to all jury trials, that after the jury are charged and have left the court to consider of their verdict, they are to be kept by themselves, without refreshment, and without communication with others, until they have agreed. Any departure from this rule is an irregularity. But it is not every irregularity which will render the verdict void, and warrant setting it aside. This depends upon another and additional consideration, namely, whether the irregularity is of such a nature as to affect the impartiality, purity and regularity of the verdict."

I might here pause and enquire what irregularity will, and what will not, vitiate the verdict? The object of jury trials suggests the answer. Common reason dictates to us what might "affect the impartiality, purity and regularity" of a verdict, and whatever might have that effect, will vitiate it, as will appear from the conclusion of Judge Shaw. After he has reviewed many of the authorities, he concludes by saying, " the result of the authorities is, that when there is an irregularity which may affect the impartiality of the proceedings, as where meat and

drink or other refreshment has been furnished by a party, or where the jury have been exposed to the effect of such influence, as where they have improperly separated themselves, or have had communications not authorised, there, inasmuch as there can be no certainty that the verdict has not been improperly influenced, the proper and appropriate mode of correction and relief is by undoing what is thus improperly and may have been corruptly done; or where the irregularity consists in doing that which *may* disqualify the jurors for proper deliberation and exercise of their reason and judgment, as where ardent spirits are introduced, there it would be proper to set aside the verdict, because no reliance can be placed upon its purity and correctness. But where the irregularity consists in doing that which does not and cannot affect the impartiality of the jury, or disqualify them for exercising the powers of reason and judgment, as where the act done is contrary to the ordinary forms, and to the duties which jurors owe to the public, the mode of correcting the irregularity is by animadversion upon the conduct of the jurors or of the officers, but such irregularity has no tendency to impair the respect due to such verdict." To me it seems that the line of distinction is here so clearly drawn, that it is impossible to mistake it, and so fortified by reason as to place it beyond doubt. It is briefly this:— If the purity of the verdict *might* have been affected, it must be set aside: if it could not have been affected, it will be sustained. A verdict on which doubts might rest cannot be good. The same learned judge says, "it must command entire confidence."

The reason here given runs through all the decided cases. In the case of the Commonwealth *v.* McCall, 1 Virginia Cases, one of the jurors separated from his fellows but for a few minutes, and spoke to no one about the trial, and yet a new trial was granted. So in the case of McLain *v.* The State, 10 Yerger, 241, in which a part of the jury separated from the balance for fifteen or twenty minutes pending the trial; this was held sufficient ground for a new trial. In neither of these cases was any such thing as a tampering with the jury shown, the courts both held that to be unnecessary, and say that it is sufficient that they might have been subject to improper influences. In the last case the court said "there would be no safety in a different rule of prac-

[Hare *v.* The State.]

tice, for it would be almost impossible ever to bring direct proof of the fact that it was done." These decisions are evidently based on the same principle with that first cited; to wit, that the purity of the verdict might have been affected.

In the case of Knight *v.* Inhabitants of Freeport, 13 Mass. Rep. 218, the verdict was set aside, because a party indirectly interested spoke to one of the jurors and told him he was deeply interested in the case, and that it was a spiteful thing on the part of the plaintiff. This case is only cited for the purpose of showing the degree of strictness necessary to make a valid verdict. The court said "too much care and precaution cannot be used to preserve the purity of jury trials." This strictness is necessary to give due confidence to the parties in the results of their causes; and every one ought to know that for any, even the slightest intermeddling with jurors, a verdict will always be set aside.

In the case of Perkins *v.* Knight, 2 New Hampshire Rep. 474, the court say that "it is of the highest importance that jurors should be preserved not only from all improper bias in causes, but even from the suspicion of improper bias."

It only remains to make an application of these principles to the case before us. If for a separation of the jury, which occasions a mere exposure to improper influence, a new trial will be granted, why should it not in the present case? The thing to be guarded against is improper influence; can it not be as well exercised in the jury room by an individual who has the art and capacity to exercise it, as it can any where else? Woodley was with the jury, how long is not known: who can say that he did not speak of the guilt of the prisoner? Who can say that he had not influence, and that his influence was not exerted to procure a verdict of guilty. If it was legal for Woodley to be with the jury, it would also be legal for any one else to be there. Suppose that he had been the prosecutor, and an influential man, could it be said, under such circumstances, that the verdict was free from suspicion? Could every one rely on it as the impartial voice of the jury? Can there be any difference between admitting a stranger into the jury room, and admitting him into the company of the jury when dispersed.

To me it seems that all the evils are fully incurred by letting

an unauthorised person into the jury room, that could be incurred by letting them separate.   It seems to be a proposition too clear to admit of a doubt, that in this way the verdict *might* be tainted with corruption or bias.   If so, the rule which I have before stated will apply.   It applies with all its force.   If the sanctity of the jury room may be violated by an intruder, there is an exposure to his influence, and when the opportunity has been offered, no one can say that it has not been used.   The verdict is opened to suspicion, and does not nor cannot command entire respect and confidence.   An artful man might infuse the poison in few words. We cannot know that Woodley did not do so; or even if we could be satisfied that he did not, another person on another occasion might, and the law is to operate by general rules.   If it were lawful for him to be there, it would be also lawful for any other person.   If lawful for one person, why not for two or more.   One man may effect as much as more could.   It is the duty of the court to swear an officer to take charge of the jury; his oath is that he will not speak to them or permit others to do so.   How useless is this ceremony if the officer may commit the jury to the keeping of one who is not sworn.   Suppose the court had called a mere bystander who was not sworn, to go out with the jury, would a verdict under such circumstances be good?   It would not, and yet are we to permit the officer to leave the jury in an exposed room, under the charge of any intruder that may happen to thrust himself into the presence of the jury ?   Suppose twelve men had been been admitted, who could say whether the verdict was the voice of those who had been sworn, or those who had not; and if one may be admitted, certainly twelve might with the same propriety..   One man may exert all the art, ingenuity and malice that twelve could.   I must think that this verdict is within the rule.   The irregularity might have affected its purity.   I am therefore led to the conclusion that a new trial should be granted.

Judge Smith concurred.

Mr. Justice Trotter dissenting from the judgment of the court in granting a new trial, delivered the following opinion.

William Hare was indicted in the circuit court of Hinds county

[Hare *v.* The State.]

for the murder of Robert Sharp.  Before the indictment was found or the grand jury were sworn, the counsel for the prisoner presented a plea, challenging the array of the panel from which the grand jury were selected, on the ground that the same was not drawn at any regular term of the circuit court, or otherwise in pursuance of the statute.  The court refused to receive this plea. The prisoner afterwards tendered a plea stating in substance that he had *before been arraigned and tried* for the same offence which was charged in the bill of indictment.  The court refused to receive this plea likewise.  The cause was then submitted to a jury, who returned a verdict of guilty.  The prisoner moved the court to grant him a new trial.  It appears that after the evidence was closed, the jury retired under the care and charge of a bailiff, who conducted them to a room in one of the hotels in the town of Raymond where the court was held.  That after they had been engaged for some time in their deliberations, a man named Woodley came into their room unobserved by the bailiff.  Woodley had occasionally acted as a special deputy of the sheriff, and the officer who had charge of the jury was under the impression that he was then one of the deputies.  It appears, however, that he had no authority to be with the jury at that time.  Woodley remained with the jury whilst the bailiff retired for a few moments to bring them some water.  There is no proof that Woodley did or said any thing calculated to have any influence against the prisoner.  The motion for a new trial was refused by the court.

The errors assigned are, 1st. The rejection of the plea which challenged the array.  2d. The rejection of a special plea of a former arraignment and trial for the same offence.  And 3d. The judgment of the court on the motion for a new trial.

1st. The record states that the panel of jurors for the term was drawn by the sheriff and clerk in vacation, without the assistance of any other officer.  This was irregular, for the act of 1830 provides that the venire shall be drawn if in the circuit court, in open court, in presence of the judge, by the clerk and sheriff; but if this shall be omitted, the same may afterwards be done by the clerk and sheriff in the presence of the judge of probates.  The plea should, therefore, have been received, unless the act of 1836 can

17*

be considered as an answer to the objection which was stated and relied on.    The 1st section of that act provides that no challenge to the array shall be sustained, nor shall any *venire facias* be quashed by any court of justice in this state.    There is a proviso that in capital cases any special *venire facias* may be quashed for partiality or corruption in the officer summoning the jury, &c. This act is a direct authority for the rejection of the challenge in this case.    This court was zealously invoked to disregard the provisions of this law, which were denounced in the argument as an unconstitutional and dangerous infringement of the right of jury trial.    The constitution of our state has asserted the importance of this institution, and guarded it in emphatic terms from the danger of violation.    In this day and in this country there can be, I apprehend, but one sentiment on this subject.    The right of trial by jury is universally looked upon as the most valuable and effectual bulwark of human rights.    And no law which should deprive the citizen of this safeguard of his life, liberty, and property could receive the sanction of any court of justice.    But I cannot regard the act of 1836 as subject to this objection.    It does not take away the right, but only provides the method of enjoying it. It is true that its provisions are open to some observations on the score of policy.    Abuses may sometimes grow out of it.    But the remedy for this, lies with the legislature, and not with this court. It is not deemed unconstitutional, and under the liberal indulgence of the right of challenge to the polls peremptory as well as for cause, it will not often happen that this law will have the effect to deprive the party of a jury, not free from objections.    The frequent instances in which the whole panel for the term had been set aside on account of some mere technical objection to the form of the process of *venire facias*, by which justice was defeated, and litigation was increased, was the cause of this law, and though it is very broad in its terms, has yet proved highly salutary to the administration of justice.    It has served to extricate justice from the web of mere technical form in which she is too often entangled.    In the case before the court I can discover no ground for arresting the regular operation of the act.    Should one of those extreme cases, which were supposed by the prisoner's counsel, ever occur, it will be the duty of the courts to pause and consider

whether it is within the spirit and meaning of the law, and to give to it such interpretation as will vindicate the constitutional right of the citizen, and uphold the public policy and public justice of the country.

2. Very few remarks are deemed sufficient to dispose of the second ground of error. The plea alleges, in substance merely, that the prisoner had before been arraigned and tried for the same offence. It does not aver either a conviction or acquittal. It is, therefore, neither a plea of *autrefois acquit,* or *autrefois convict.* The plea was attempted in the argument to be sustained on the authority of that great principle of the common law applicable to criminal jurisprudence, that no man shall be twice put in jeopardy for the same offence. There is no question as to the principle, and it has been expressly sanctioned in this country by a constitutional enactment. In the constitution of the United States it is thus expressed : "Nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." This phrase is well known in the law, and is considered as descriptive of the class of punishments inflicted for crimes amounting to felony, whether the punishment be loss of life or limb. And hence, this clause in the constitution is considered as equivalent to a declaration that no man shall be twice tried for the same offence. In the application of this maxim, it is important however, in each case to consider, whether the party who claims its benefit has been really put in jeopardy, and for the same offence. For a man may have been tried, and yet have been in no jeopardy, in the sense in which this term is understood at common law, and in the constitution. Thus if the court have no jurisdiction, no valid judgment could be rendered, and the maxim does not apply to a trial before such a tribunal. Or, if the indictment was defective, so that no punishment could be awarded upon a conviction, or, if during the trial, a juror is suddenly taken ill or dies, or the prisoner becomes so indisposed as not to be able to attend his trial, or from any other urgent necessity the progress of the trial is interrupted, another jury may be empannelled, and the prisoner again put upon his trial. And so when the prisoner has been convicted, and the judgment has been arrested at his instance, and likewise, when the jury cannot agree after the proper efforts, and there is no prospect of a verdict, and

the powers of the court are about to terminate, and under this ne-
cessity they are discharged, the prisoner may again be put upon
his trial. In all these cases, the prisoner may be said to have
been in jeopardy by the first trial, and yet, as the event has shown
that there was no legal trial, he was not in jeopardy in the true
sense of the maxim. See the case of Commonwealth *v.* Roby, 12
Pick. Rep. 502. Bowden's case, 9th Mass. Rep. 494. The Peo-
ple *v.* Goodwin, 18 J. R. 187. United States *v.* Perez, 9 Wheat.
579. Hence, it is necessary in every plea which seeks for the
prisoner the benefit of this maxim, to aver a conviction or acquit-
tal, on a former trial for the same offence. This was so express-
ly held by the court of appeals of Kentucky, in the case of the
Commonwealth *v.* Olds, 5 Littell's Rep. 139, in which a very lucid
and satisfactory explanation is given of the maxim under consid-
eration. Upon the two grounds of error which I have noticed,
the other judges fully concur in opinion with me.

3. I come now to consider the objection to the verdict, which is
the only remaining subject of inquiry ; and regret that I cannot
agree with the other judges on this point. This objection is rested
on the single ground that Woodley was in the jury room for a few
moments, whilst they were consulting about their verdict. This
man was an entire stranger to the prisoner, for aught that appears
from the record, and there is no fact presented to the court upon
which any imputation can be made against him on the score of
interest or feeling. He is not shown to have had any motive to
prejudice the cause of the prisoner, and he neither did nor said
any thing for or against him. The jury had no agency in procu-
ring his presence, nor are they charged in any thing with impro-
priety, or misbehavior. Woodley was a mere intruder, nor is it
shown that his presence was at all countenanced by any member
of the jury. Is this naked, dry fact, standing by itself on the rec-
ord, sufficient to destroy the deliberate and solemn determination
of the jury. I confess I can see no pretext for giving it such influ-
ence, either in principle or adjudged cases. On that principle I do
not see how any verdict can stand. Verdicts may and should be
set aside for a mistake in the jury, by which injustice has been
done, or for corruption or partiality in any of the members of the
jury; or for such misbehavior as naturally tends to affect the impar-

[Hare *v.* The State.]

tiality, purity and regularity of the verdict.  It will not do to determine that every irregularity on the part of the jury will avoid their verdict.  It is important to the welfare of society and the ends of justice, that impartiality and purity should mark and govern the conduct of juries.  Their verdict should command entire confidence.  But it is equally essential to the peace and harmony of society, that verdicts should not be lightly set aside.  The law must repose some confidence in the honesty of juries, and the integrity of their verdicts; so much at any rate as not to presume any vice in them as such, until it is established by proof.  To set aside the present verdict, this reasonable presumption must be entirely disregarded; nay, the court must indulge the contrary presumption.  This I cannot consent to do.  Nor have I been able to find one adjudged case which would require me to do it.  For I have yet seen no case in which the verdict has been set aside, unless some misconduct or irregularity of the jury has been shown.

The ground on which the court is asked to vacate this verdict, is the mere impropriety of Woodley, a stranger.  The case of the Commonwealth *v.* Roby, 12 Pick. Rep. 516, fully sustains the views which I have here expressed, and as this is the case on the authority of which the majority of the court have considered themselves bound to reverse the judgment in the present case, I will notice it somewhat at length.

Roby was indicted for murder, and convicted.  A motion was made to set aside the verdict, on the ground of irregular conduct in the jury.  The irregularity complained of consisted of the following facts:—After the jury had retired to consider of their verdict, and after they had been for some time engaged in their deliberations, some of them told one of the constables that they were faint, and asked him whether they could not obtain some refreshment; and the constable thereupon went to a grocer's shop and procured crackers and cheese, and two bottles of cider, which were carried into the jury-room by the constable and the grocer's boy; that whilst the constable and the boy were in the room one of the jurors said that two bottles were not enough, and the constable told the boy to bring two more; the boy brought them and delivered them to the constable, who carried them into the room, &c.  The court refused to set aside the ver-

[Hare *v.* The State.]

dict, on the ground that though it might have been an irregularity to drink cider and admit the boy in the room, yet it was not an irregularity for which the verdict could be avoided.

There was in that case an irregularity charged against the jury: in this case there is none. In that case the judge says, that the question whether misbehaviour in the jury shall set aside their verdict, depends upon another question, and that is, whether the misbehaviour or irregularity is of such a nature as to affect the impartiality, purity, and regularity of the verdict. Here the judge gives the rule and also a practical illustration of it, and he did not consider the irregularity complained of in that case as necessarily tending to affect the verdict. How, then, can this court hold that the irregularity of a mere stranger, in which the jury in no way participated, can affect their verdict?

In the conclusion of his opinion, Judge Shaw observes, that the result of the authorities is, that when the jury have so acted *as to expose themselves to influences which may affect their verdict,* as when they have improperly separated themselves, or had communications not authorised, then, as there can be no certainty that the verdict has not been improperly influenced, the proper mode of correction is to set aside the verdict.

The rule is here laid down in terms as broad as possible for the prisoner at the bar, and in terms much broader than what the judge in the preceding part of his opinion had allowed himself. For he has cited several authorities in his opinion to show that an unauthorised separation of the jury is not ground to reverse the judgment; and amongst others, that of the King *v.* Kinnear, 2 Barn. & Ald. 462; St. John *v.* Abbott, Barnes, 441. And he might also have referred to many other cases, to show the same doctrine, and where the judges have determined that though it is a misdemeanor of the jury, for which they may be fined, yet it will not of itself vitiate their verdict. In King *v.* Moseley *et al.* 18 Eng. C. L. Reports, 115, this point was fully settled, after full argument. But as there was no separation of the jury in this case, it is unnecessary to consider this point further. And it is quite evident to me that Judge Shaw could only have intended, at most, by the irregularity referred to in his concluding remarks, some positive act, such as an unjustifiable separation of the jury,

or some actual unauthorised communication under circumstances tending to expose the jury to undue influences.

This case cannot therefore, in my opinion, come within the rule thus laid down, any more than the case he was considering. The case of Park, in 2 Roll's Reports, 85, is identical in principle with the one at bar. In that case a juror was challenged and withdrawn, but went out with the jury and remained with them above half an hour; and yet the judges held that this, though a misdemeanor in the juror, for which he might be punished, yet that it was not of itself sufficient to set aside the verdict. This was as strong a case as the one at bar. That was surely a case where there was as much room for conjecture that improper influence had been exerted, as in the present case; yet the court very properly, as I conceive, refused to indulge in conjecture, or to visit upon the jury the impropriety or misbehavior of a stranger.

I am clearly of opinion that there is no ground for reversing the verdict.