IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0577-05






Ex parte SWANDA MARIE LEWIS, Applicant






ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


TARRANT COUNTY





 Keller, P.J., delivered the opinion of the Court in which WOMACK,
KEASLER, HERVEY, and COCHRAN, JJ., joined. COCHRAN, J., filed a concurring
opinion. PRICE, J., filed a dissenting opinion in which MEYERS, and HOLCOMB, JJ.,
joined. JOHNSON, J., dissented.


O P I N I O N 



 In Oregon v. Kennedy, the United States Supreme Court held that the Fifth Amendment's
Double Jeopardy Clause barred retrial after a defendant successfully moved for mistrial only when
it was shown that the prosecutor engaged in conduct that was "intended to provoke the defendant
into moving for a mistrial." (1) In Bauder v. State, we interpreted the Double Jeopardy provision of
the Texas Constitution more expansively, to cover "reckless" conduct, holding that retrial would also
be barred "when the prosecutor was aware but consciously disregarded the risk that an objectionable
event for which he was responsible would require a mistrial at the defendant's request." (2) We granted
review to reexamine Bauder's holding. (3) We conclude that Bauder should be overruled and that the
proper rule under the Texas Constitution is the rule articulated by the United States Supreme Court
in Oregon v. Kennedy.

I. BACKGROUND


 Appellant called 911 after killing her husband. When officers arrived, they placed her in a
patrol car, and eventually she was taken to the police station. At the scene and at the station,
appellant gave statements after receiving Miranda (4) warnings. At trial, the prosecutor asked three
sets of questions that the court of appeals deemed relevant to its analysis. First, the prosecutor asked
the crime scene officer, "When you met with [Appellant] Swanda Wiley, is that the name that she
was giving you then?" (5) Second, while the prosecutor cross-examined appellant, the following
occurred:

Q. Did you ever tell the 911 operator [Kenneth Wiley] had been raping [you], he had
been attacking [you]?


A. No.


Q. In fact, you never told any law enforcement about the rape? (6)


The next day, during further cross-examination of appellant, the following occurred:

Q. After speaking with [Detective] John McCaskill on August 10th of the year 2000,
did you have occasion to learn the next day, on August 11th of the year 2000, John
McCaskill wanted to speak with you again?


A. Yes.


Q. And you denied him opportunity to speak - (7)


After the first question, and after the last question in each of the two succeeding sequences, defense
counsel objected that the prosecutor had commented on the defendant's post-arrest silence in
violation of Article 38.08 of the Texas Code of Criminal Procedure, Article I, §10 of the Texas
Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution. (8) All three
objections were sustained, and instructions to disregard were requested and given in connection with
the second two sets of questions. (9) A mistrial was not requested on the first question, was requested
and denied with regard to the second set of questions, and was granted after the third set of
questions. (10)

 Appellant later filed a pretrial habeas application, claiming that any subsequent prosecution
was barred under double jeopardy principles, but the trial court denied relief. (11) After discussing this
Court's latest opinion on the Bauder standard, (12) the court of appeals reversed, holding that "the
prosecutor, at the least, engaged in this conduct with conscious disregard for a substantial risk that
the trial court would be required to declare a mistrial." (13)

II. STARE DECISIS


 In conducting a re-examination of precedent, we keep in mind the strong preference for
adhering to past decisions: "Often it is better to be consistent than right." (14) Precedent can be
overruled, however, if the reasons for doing so are weighty enough. (15) Some factors supporting the
overruling of precedent are: (1) that the original rule or decision was flawed from the outset, (16) (2)
that the rule's application produces inconsistent results, (17) (3) that the rule conflicts with other
precedent, especially when the other precedent is newer and more soundly reasoned, (18) (4) that the
rule regularly produces results that are unjust, that are unanticipated by the principle underlying the
rule, or that place unnecessary burdens on the system, (19) and (5) that the reasons that support the rule
have been undercut with the passage of time. (20)

 The State points to, and disputes, two currently accepted legal propositions upon which
Bauder's holding rests. The first is that the Texas double jeopardy protection embraces the mistrial
setting. The second is that the Texas double jeopardy protection imposes a different standard than
its Fifth Amendment counterpart for determining when a defense-requested mistrial can properly be
attributed to the State for the purpose of barring further prosecution. Overruling either of these legal
propositions would result in eliminating the rule announced in Bauder. We will examine each
proposition in light of the factors articulated above.

III. MISTRIALS


A. The Issues


 The State contends that, properly construed, the Texas double jeopardy provision does not
apply to the mistrial setting. This contention has also been advanced in dissenting opinions in
Bauder and its progeny. (21) If this interpretation were adopted, the result would be to hold that, in
some respects, the Texas constitutional provision actually provides less protection than its Fifth
Amendment counterpart, and as a result of the way in which it provides less protection, would
obviate any inquiry in this case into whether it might be more expansive in other respects. (22) In the
language of Hulit, if the mistrial setting is not part of the state double jeopardy "building," then one
has no occasion to determine whether that building contains a recklessness "floor" not found in the
federal double jeopardy building. (23)

 The State makes two basic arguments in support of its position. First, the State claims that
the "mistrial species" of double jeopardy jurisprudence was not part of the common law that formed
the basis for the Texas constitutional provision. Relying upon Justice Powell's dissenting opinion
in Crist v. Bretz, (24) the State contends that, instead, the "mistrial species" traces its lineage through
English common law to an independent rule of jury practice, formulated by Lord Coke, that
prohibited needless discharges of the jury. The State further asserts that "a bar to re-prosecution
because of a premature termination of the first trial because of mistrial did not even emerge as a
constitutional principle of double jeopardy jurisprudence until 1949 when the Supreme Court
delivered its opinion in Wade v. Hunter," (25) which imported Lord Coke's rule. Consequently, the
State concludes, "it becomes almost ludicrous for one to truly believe that the framers of the Texas
constitution in 1876 had contemplated a double jeopardy protection that did not even come into
existence until more than seventy years later." In line with the State's position, the dissent in
Peterson II had concluded that "during the approximately 150 years before our decision in Bauder
I, our state constitutional double jeopardy provision had never been interpreted as having any
application to the mistrial setting." (26) 

 Second, the State contends that legislation passed in 1856 - defining double jeopardy solely
by conviction or acquittal - reflected the intent of the framers of the Texas Constitution. The State
points out that this legislation was passed a mere eleven years after the Texas Constitution of 1845
(containing a predecessor of the current double jeopardy provision) and twenty years before the
Constitution of 1876 (containing the current double jeopardy provision). The dissents in Peterson
II and Lee II made the same argument. (27)

 Finally, we include in this discussion a third argument, made by former Presiding Judge
McCormick in his dissent in Bauder: that the state double jeopardy provision's language suggests
that it applies only to acquittals. (28) His opinion quotes the state provision with the following in
italics, suggesting that he believed that the italicized clause modifies the entire provision rather than
the immediately preceding clause: "no person, for the same offense, shall be twice put in jeopardy
of life or liberty, nor shall a person be again put upon trial for the same offense, after a verdict of not
guilty in a court of competent jurisdiction." (29) 

B. Before the 19th Century


 The Fifth Amendment's Double Jeopardy Clause provides: "nor shall any person be subject
for the same offence to be twice put in jeopardy of life or limb." (30) This provision was framed in light
of a long history of the concept of double jeopardy in English common law. The development of
double jeopardy law in England and the history of its incorporation into the United States
Constitution is discussed in various Supreme Court and state court opinions. There seems to be no
dispute between the majority and dissent in Bretz regarding the historical developments, so we rely
heavily upon Justice Powell's dissent, along with information from other sources. 

 In English common law, "jeopardy" referred to the principle underlying the doctrines of
autrefois acquit and autrefois convict. (31) A defendant was considered to be placed twice in jeopardy
upon a second trial only if there existed a prior conviction or acquittal. (32) Essentially, the doctrine
embodied "a res judicata policy" for criminal cases. (33) That policy required an actual acquittal or
conviction for its implementation. (34) The debates in 1789 on the Bill of Rights confirmed that the
framers of the United States double jeopardy provision understood that it would operate in such a
manner. (35)

 There is also some historical indication that the phrase "life or limb" in the Fifth Amendment
was intended to perform a limiting function. One commentator has argued strenuously that the
phrase was intended literally to encompass only capital cases. (36) But that interpretation seems to
discount the words "or limb," which, even under a literal interpretation, suggests application to lesser
punishment. Several old state court cases indicated that the phrase "or limb" was used to refer to
a category of serious offenses, punished long ago in England by dismemberment, that came to be
known as "felonies." (37)

 Separate from pleas in bar that formed the basis for the doctrine of double jeopardy, a rule
was laid down by Lord Coke prohibiting the discharge of juries: once the jurors were "retorned and
sworn, their verdict must be heard, and they cannot be discharged." (38) The rule was originally an
absolute command that "once banded together a jury should not be discharged until it had completed
its solemn task of announcing a verdict." (39) Even during deliberations, the jury was required to be
kept together "unfed and without drink" even "till death if they do not agree." (40) The harshness of
this rule was soon mitigated with two exceptions: necessity (41) and consent of the defendant. (42) In the
seventeenth century, Lord Coke's rule became a useful defense against Crown oppression - 
precluding the "tyrannical practice" of permitting discharge of the jury and reindictment when
acquittal seemed likely. (43)

 However, this rule against discharge was one of jury practice and was not a basis for the pleas
in bar from which the doctrine of double jeopardy arose. (44) The early cases and treatises announced
no clear standard regarding the effect of failing to follow the rule, and it "seems never to have been
pleaded successfully in bar of a second prosecution in the period of the Year Books, when the rule
is said to have arisen." (45) "In any event, it seems never to have furnished the basis for a plea of
autrefois acquit. Rather, it was viewed as a matter committed to the discretion of the trial judge,
from which no writ of error would lie nor any plea in bar of a future prosecution would be
allowed." (46)

 In Bretz, the Supreme Court majority acknowledged this history but responded, "But this
constitutional understanding was not destined to endure." (47) 

C. 19th Century Developments in Other Jurisdictions 


 In 1795, less than four years after the Bill of Rights was ratified, the Supreme Court of North
Carolina invoked Lord Coke's rule against unnecessary discharges to bar retrial in a capital case after
the premature discharge of a jury, and the court specifically stated that it would "not again put [the
defendant's] life in jeopardy." (48) The court explained that, during the reign of the Stuart family in
England, the Crown often dismissed a prosecution during the middle of the trial "for the purpose of
having better evidence against [the defendant] at a future day," and the court condemned that practice
as "so abhorrent to every principle of safety and security, that it ought not to receive the least
countenance in the courts of this country." (49) 

 After that opening salvo, state courts in the nineteenth century split on whether mistrials
implicated their state constitutional protections against double jeopardy. Led by New York, a
number of state courts hewed to the traditional understanding that double jeopardy was implicated
only after a previous conviction or acquittal. (50) But North Carolina reaffirmed its earlier holding as
a correct articulation of double jeopardy principles, (51) and it was joined in its position by
Pennsylvania, Tennessee, South Carolina, and Ohio. (52) Subsequently, several other jurisdictions
switched sides to join the trend towards incorporating Lord Coke's rule into double jeopardy
jurisprudence. (53) By 1876, the Supreme Court of Nevada would confidently say that "the rule now
seems to be pretty well settled in American courts" that double jeopardy protections extended to the
premature termination of a trial. (54) 

 In deciding to import Lord Coke's rule into double jeopardy jurisprudence, several courts
looked to the plain meaning of the word "jeopardy" in finding that the protection necessarily
extended to proceedings occurring before verdict: someone was in "jeopardy," or peril, of his life
or liberty when he was put to trial, not after the verdict was delivered. (55) One of the opinions issued
in the Waterhouse case by the Supreme Court of Tennessee acknowledged the tension between the
"common acceptation" of the word "jeopardy" and the history of its usage in English common law. (56) 
"But for a long course of judicial opinion to the contrary," the Tennessee justice wrote, "I should be
at a loss to attach a different meaning to the expression." (57) Ultimately, he appeared to harmonize
ancient English law with ordinary language by concluding that the term "acquittal" could "include
the case of illegal discharge of the jury - in which case the defendant is virtually acquitted, and is
entitled to be also discharged." (58) Even one of the jurisdictions adhering strictly to the common law
of England acknowledged the conflict between popular usage and established tradition: "If this were
a question of first impression, grave doubts might be entertained as to its proper solution. The
constitutional prohibition, interpreted in its popular sense, would seem to bear the construction put
upon similar provisions, in Pennsylvania, North Carolina, [and] Tennessee." (59)

 Several jurists in these state cases also reasoned that the prohibition against placing a person
"twice in jeopardy of life or limb" must necessarily mean more than the age-old common law
principle that prior judgments were given preclusive effect - a principle that applied even in civil
cases - because that common law principle was in no need of special protection. (60) In addition, one
of the justices in the Pennsylvania case opined that according double jeopardy effect to a wrongful
discharge of the jury was also necessary to effectuate the state constitutional provision requiring that
the right to trial by jury "remain inviolate." (61) Finally, some courts expressly found that according
such double jeopardy effect was necessary to protect the very interests of the double jeopardy clause
itself, to safeguard against the possibility that the trial court would discharge a jury and order a retrial
simply because a prosecution witness was absent or the proof offered was insufficient to support the
conviction. (62)

 Most of the state decisions importing Lord Coke's rule against discharges into double
jeopardy jurisprudence contained the express pronouncement that an illegal discharge of the jury
operated as an acquittal. (63) Virtually all of the importing cases were in agreement, however, that a
discharge was legal (and thus did not operate as an acquittal) if there was necessity or the defendant
consented (assuming he had an attorney). (64) Although most of the cases in which relief was granted
involved the discharge of the jury during deliberations or later, (65) several state courts expansively
pronounced that jeopardy attached when the jury was impaneled, sworn, and charged with the case. (66) 
By "charged with the case," these authorities meant charged in the sense of being charged as jurors 
at the beginning of trial. (67)

 Although the United States Supreme Court did not start the trend of incorporating Lord
Coke's rule against unnecessary discharges into double jeopardy jurisprudence, the Court issued a
decision that had the effect of fueling it. In United States v. Perez, the jury was discharged because
it could not agree upon a verdict, and the defendant claimed that the discharge operated as a bar to
further prosecution. (68) The Supreme Court held that it did not, but in language that suggested that the
absence of a bar might turn upon the existence of "manifest necessity" for the jury's discharge:

We are of opinion, that the facts constitute no legal bar to a future trial. The prisoner
has not been convicted or acquitted, and may again be put upon his defence. We
think, that in all cases of this nature, the law has invested Courts of justice with the
authority to discharge a jury from giving any verdict, whenever, in their opinion,
taking all the circumstances into consideration, there is a manifest necessity for the
act, or the ends of public justice would otherwise be defeated. They are to exercise
a sound discretion on the subject; and it is impossible to define all the circumstances,
which would render it proper to interfere. To be sure, the power ought to be used with
the greatest caution, under urgent circumstances, and for very plain and obvious
causes; and, in capital cases especially, Courts should be extremely careful how they
interfere with any of the chances of life, in favour of the prisoner. But, after all, they
have the right to order the discharge; and the security which the public have for the
faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other
cases, upon the responsibility of the Judges, under their oaths of office. We are aware
that there is some diversity of opinion and practice on this subject, in the American
Courts; but, after weighing the question with due deliberation, we are of opinion, that
such a discharge constitutes no bar to further proceedings, and gives no right of
exemption to the prisoner from being again put upon trial. (69)


In the late twentieth century, the Supreme Court would acknowledge that "a close reading" of the
above passage "could support the view that the Court was not purporting to decide a constitutional
question, but simply settling a problem arising from the administration of federal criminal justice." (70) 
But the Supreme Court made no clear pronouncement to that effect in the nineteenth century, (71) and
in fact, it implied in an 1874 decision - Ex parte Lange - that Perez was indeed a double jeopardy
case. (72)

 In the meantime, states on both sides of the issue cited Perez in support of, or at least in
discussion of, their respective positions. (73) Citing or discussing Perez and state cases, at least three
respected nineteenth-century American commentators concluded that jeopardy attached at the time
the jury was impaneled and sworn and that termination of the trial without a verdict - absent
necessity and against the defendant's wishes - resulted in a bar to future prosecution. (74) Two of those
commentators expressly recognized that there were decisions to the contrary but concluded, from
the language of various double jeopardy provisions, the consequences of a contrary rule to a
defendant's double jeopardy interests, or the prevailing common-law practice, that their view was
the better one. (75) 

 In light of the various authorities, some states took intermediate positions. Some claimed
that the improper dismissal of a jury resulted in barring a future trial but did not claim that the bar
flowed from the protection against double jeopardy, (76) or expressly claimed that it did not, (77) or
claimed that a new trial might be barred if prejudice occurred. (78) Others avoided general
pronouncements, saying simply that there was no bar if necessity existed (79) or the defendant
consented. (80) 

D. 19th Century Developments in Texas


 Texas adopted its first double jeopardy provision in 1836, when it was an independent
republic. The ninth section of the Declaration of Rights of the Constitution of the Republic of Texas
provided: "No person, for the same offence, shall be twice put in jeopardy of life or limbs. And the
right of trial by jury shall remain inviolate." (81) Upon joining the United States, Texas drafted a new
constitution, adopted in 1845. This new state constitution deleted the "s" from "limbs," added a new
clause, and made some minor changes in punctuation, causing the section to then read: "No person,
for the same offense, shall be twice put in jeopardy of life or limb, nor shall a person be again put
upon trial for the same offence after a verdict of not guilty; and the right to trial by jury shall remain
inviolate." (82) When Texas became part of the Confederate States during the War Between the States,
it drafted a new constitution, adopted in 1861. The text of the section containing the double jeopardy
provision remained the same, except that the comma after "limb" became a semicolon. (83) With the
defeat of the Confederacy, and the resultant new constitution of 1866, the semicolon was changed
back to a comma. (84) In 1869, under a new constitution adopted as a result of reconstruction, the
words "or limb" were deleted, a semicolon was placed after "life," and a new comma was inserted
after the second appearance of the word "offense," causing the section to read as follows: "No
person, for the same offense, shall be twice put in jeopardy of life; nor shall a person be again put
upon trial for the same offense, after a verdict of not guilty; and the right of trial by jury shall remain
inviolate." (85) Finally, the present state constitution, adopted in 1876, inserted additional language in
two different places, changed a semicolon to a comma, and moved the "jury trial" clause to a
separate provision, resulting in what is now the present double jeopardy provision: "No person, for
the same offense, shall be twice put in jeopardy of life or liberty, nor shall a person again be put
upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction." (86)

 In the midst of these constitutional changes, the Legislature enacted laws articulating its own
view of double jeopardy. The 1856 Code of Criminal Procedure provided:

Art. 18. No person for the same offence can be twice put in jeopardy of life or limb.
This is intended to mean that no person can be subjected to a second prosecution for
the same offense, after having been once prosecuted in a Court of competent
jurisdiction and duly convicted.


Art. 19. The foregoing article will exempt no person from a second trial, who has
been convicted on an illegal instrument or information, and the judgment thereupon
arrested, nor where a new trial has been granted to the defendant, nor where a jury
has been discharged without rendering a verdict, nor for any case other than that of
a legal conviction.


Art. 20. By the provisions of the Constitution, an acquittal of the defendant exempts
him from a second trial, or a second prosecution for the same offense, however
irregular the proceedings may have been; but if the defendant shall have been
acquitted upon trial, in a Court having no jurisdiction of the offense, he may,
nevertheless, be prosecuted again in a Court having jurisdiction. (87)

 

The provisions of Section 19 were later carried forward as Section 20 of the 1879 Code of Criminal
Procedure. (88)

 In the 1871 decision of Moseley v. State, the Texas Supreme Court addressed whether the
state double jeopardy protection applied when a trial was terminated prematurely. (89) The defendant
was tried for a capital offense, and his case was submitted to the jury, but the jury was discharged 
(without his consent) because the jurors could not agree upon a verdict. (90) In response to the
defendant's claim that the discharge created a double jeopardy bar to retrial, the Texas Supreme
Court acknowledged that the issue involved an area of disagreement among various jurisdictions:
"All authorities agree that the word jeopardy, in its common and legal signification, means danger
or hazard, but many disagree as to the time when that danger begins to a person charged with an
offense, and when it ends." (91) The court observed that the defendant's position was maintained by
"Lord Coke . . . and the courts of Pennsylvania, Tennessee and some other states," (92) but the court
expressed its own belief that the question of double jeopardy protection had "finally been settled by
the highest authority in England and America to have reference to the trial and the verdict" so that
no person could "claim an exemption from a second trial under this maxim, unless he has once been
tried . . . and acquitted or convicted." (93) Nevertheless, the court also pointed out that even the
authorities finding double jeopardy principles to be applicable in this context found an exception in
the case of necessity. (94) And the court further concluded that, if necessity be considered an exception,
then, logically, the issue of whether to discharge a jury is simply a matter addressed to the trial
court's sound discretion. (95) In support of that conclusion, the court cited the United States Supreme
Court's decision in Perez and its own conclusion that a contrary decision would be based upon the
unacceptable notion that "it is preferable to confine and perhaps starve a jury for an indefinite period,
and thereby force from them a reluctant verdict against their judgment rather than permit the court
to exercise that dangerous discretion to discharge a jury, when it became morally certain that they
could not arrive at an intelligent and honest verdict." (96)

 The next year, the Texas Supreme Court revisited the issue in Taylor v. State. (97) The
defendant in that case was initially indicted for the murder of N. Evans, but the proof at trial showed
that he killed Morgan Evans. (98) After the State's opening argument, the prosecutor entered a nolle
prosequi (a nonsuit of the prosecution), and the jury was discharged. (99) The State subsequently filed
a new indictment charging the defendant with the murder of Morgan Evans. (100) Citing Moseley, the
court reiterated its holding that the double jeopardy protection could not be invoked in a second
prosecution unless there had been a prior "trial and verdict." (101) The court observed that "Mr. Bishop,
in his valuable work on criminal law, seems to entertain a somewhat different view," but because
of the numerous exceptions cited, the court concluded that the discussion really lent support to its
own view that discharging the jury in the first trial was simply a matter to be left within the trial
judge's discretion, with no attendant double jeopardy consequences. (102) However, the court also
observed that double jeopardy might not in any event apply because the murders of N. Evans and
Morgan Evans constituted "separate and distinct offenses." (103)

 Although the Texas Supreme Court had aligned this state with those jurisdictions hewing
strictly to the common law of England, that would soon change when criminal appeals were handled
by our predecessor, the Court of Appeals (assigned that responsibility by the Constitution of 1876). (104) 
In the 1877 case of Parchman v. State, the defendant claimed that double jeopardy barred retrial after
the case was dismissed pursuant to a nolle prosequi. (105) After the jury had been impaneled and sworn,
and during the testimony of the State's witness, it was discovered that the indictment erroneously
referred to the victim as "H. Franks" when his name was in fact "H. Frank." (106) The jury was
discharged over the protest of the defendant, and a new indictment, alleging the correct name, was
filed. (107) The Court of Appeals observed that there had "been quite a conflict of opinions in this
country" regarding whether the double jeopardy protection was implicated by the premature
termination of a trial. (108) "[A]fter a careful examination of the authorities," the court concluded that
the double jeopardy protection did apply, but with exceptions for when the defendant consented or
in a variety of circumstances that could be reasonably characterized as necessity: 

We believe . . . that if the court had no jurisdiction of the cause, or if the indictment
was so defective that no valid judgment could be rendered upon it, or if by any
regular necessity the jury are discharged without a verdict - which might happen
from the sickness or death of the judge of the court, or the inability of the jury to
agree upon a verdict after sufficient deliberation and effort - or if the term of court
as fixed by law comes to an end before the trial is finished, or the jury are discharged
with the consent of the defendant, expressed or implied, or if, after verdict against the
accused, it has been set aside on his motion for a new trial or in arrest of judgment,
the accused may, in all such cases, again be put upon trial for the same facts charged
against him, and the proceedings had will constitute no protection. But, when the
legal bar has once attached, the government cannot avoid it by varying the form of
the indictment. If the first indictment was such that the accused might have been
convicted under it on proof of the facts by which the second is sought to be sustained,
then the jeopardy which attached to the first must constitute a protection against a
trial on the second. (109)


With regard to the case before it, however, the court concluded that a second trial was not barred by
double jeopardy because, due to a material variance in the name of the victim, the second indictment
charged a different offense from the first. (110)

 The next year, in Vestal v. State, the Court of Appeals was confronted with whether parol
evidence was admissible to show the actual status of a first trial in connection with a defendant's
special pleas of autrefois acquit and former jeopardy. (111) In its discussion, the Court quoted with
approval the above passage from Parchman, and it also quoted a statement from the defendant's
brief in that case regarding the attachment of jeopardy at the beginning of trial and the acquittal
consequences of a premature termination of the proceedings:

[W]hen a party is once placed upon his trial for a public offense, involving life or
liberty, on a valid indictment, before a competent court, with a competent jury
impaneled, sworn, and charged with the case, he has then reached and is placed in
jeopardy . . . and, after the jeopardy has once so attached, a discharge of the jury
without the consent of the defendant, before they have reached a verdict, is
equivalent to a verdict of acquittal. (112)


 Arguably the pronouncements in Parchman and Vestal were dicta because they were not
necessary to the resolution of those cases and because neither case referred to the conflicting
holdings in Moseley and Taylor. Any cloudiness in the law on that account would disappear in
1884, however, with the advent of Powell v. State. (113)

 In Powell, the defendant claimed that the Texas double jeopardy provision prevented his
retrial after the jury was discharged in his first trial for failure to agree on a verdict. (114) At the first
trial, the jurors returned to the courtroom after deliberating for one-and-a-half hours to say that they
could not - and would never be able to - agree on a verdict. (115) The trial judge sent the jurors out to
deliberate for another hour, after which they returned to again say they could never agree. (116) The trial
judge sent the jurors out a third time, and they returned an hour later with the same results. (117) The
trial judge then discharged the jury over the defendant's objection. (118) 

 In attempting to ascertain the meaning of the double jeopardy provision found in the Texas
Constitution, the Court of Appeals first examined Articles 18 and 19 of the Texas Code of Criminal
Procedure of 1856 (and the successor Article 20 in the Code of Criminal Procedure of 1879). (119) The
Court observed that "if it could so be done, a fixed and definite meaning has been given by the
Legislature to the words 'former jeopardy,' and that meaning, as declared, is that 'former jeopardy'
is nothing short of a prior legal conviction." (120) But the Court held that the Legislature had no
authority to construe a constitutional provision "which has become fixed and settled by judicial
determination." (121) Acknowledging "a diversity of [judicial] views" on the meaning of jeopardy, the
Court nevertheless maintained that resolving uncertainty on the matter was not for the Legislature
but for the courts to decide. (122)

 The Court then cited with approval the views of Cooley and Bishop, and the second edition
of Bennett and Heard's note to United States v. Perez, all three of which advocated application of
double jeopardy protection to the premature termination of a trial. (123) The court quoted from Cooley's
treatise for the proposition that jeopardy attached at the time the jury was "impaneled and sworn,"
that the defendant at that time became entitled to a verdict that would bar a new prosecution, and that
the defendant could not "be deprived of this bar by a nolle prosequi entered by the prosecuting
officer against his will, or by a discharge of the jury and continuance of the cause." (124) The Court
found that this view was "uniformly" supported by "the decided weight and respectability of
authority." (125) The Court observed that Bennett and Heard's note contained the "most thorough
discussion and elaboration of authorities upon this subject" which "fully sustain[ed]" the Court's
conclusion. (126) The Court also quoted with approval from its prior opinion in Vestal (quoted above
herein), and, recognizing the prior Texas cases expressing a contrary view, the Court overruled
Moseley and Taylor. (127)

 The Court then recognized Parchman (also quoted above herein) as setting forth the
circumstances under which a jury could be discharged without creating a bar to future trial (i.e.
consent and necessity), which included "where [the jurors] have been kept together for such time as
to render it altogether improbable that they could agree." (128) The Court found that a mere three-and-a-half hours was not enough time to determine that the jury could never agree upon a verdict. (129) 
Consequently, the Court concluded that the trial judge "abused his discretion" in discharging the jury
and, therefore, that the defendant's plea of double jeopardy was correct. (130) As a result, the Court
reversed the trial court's judgment and dismissed the prosecution. (131) 

E. Evaluation


 We first address the argument that the Texas double jeopardy provision applies only to
acquittals. As explained above, the provision, remaining unchanged since 1876, states: "No person,
for the same offense, shall be twice put in jeopardy of life or liberty, nor shall a person again be put
upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction." At
best, the conclusion that this provision applies only to acquittals is based upon one possible (but not
necessarily the most likely) construction of an ambiguously punctuated sentence. That construction
is problematic because it would render wholly redundant the entire clause of the statute referring to
"jeopardy of life or liberty." Moreover, earlier versions of the constitutional provision make clear
that the language containing the words "put upon trial . . . after a verdict of not guilty" was intended
to comprise a separate clause from the clause referring to "jeopardy of life or liberty": it was added
as a separate clause to the Constitution of 1845 and all prior versions containing the language were
punctuated (through the omission of a comma or the timely placement of a semicolon) in a manner
that made this obvious. Further, none of the old judicial decisions have interpreted the provision to
apply only to acquittals, and in fact, a 1900 decision held that the Texas double jeopardy provision
actually contained two "jeopardy" protections: one prohibiting a second jeopardy of life or liberty
and the other prohibiting a second trial after a verdict of not guilty. (132) 

 Finally, there are at least two reasons why the framers might have wanted two separate
protections. By its language, the "verdict of not guilty" clause extends to all types of criminal
prosecutions, regardless of the type of punishment, but the language "jeopardy of life or liberty"
suggests application only to death or imprisonment - excluding offenses for which the only
punishment is a fine or the forfeiture of property. Thus, an express acquittal - a verdict of not guilty
- would have preclusive application in a broader spectrum of cases than do convictions or implied
acquittals. In addition, if the framers were aware of various conflicts in double jeopardy
jurisprudence among the states, having the two clauses would ensure that verdicts of not guilty
would broadly be given the desired preclusive effect regardless of how other aspects of double
jeopardy law were ultimately decided.

 We next address the State's claim that the "mistrial species" of double jeopardy jurisprudence
was not a part of the common law that formed the basis for the Texas constitutional provision. The
State's claim that this species of double jeopardy jurisprudence did not even emerge until 1949 is
correct, if at all, only as a matter of federal constitutional law. As the above discussion shows,
application of double jeopardy protection to the premature termination of trial (133) occurred at the state
level as early 1795 and became an accelerating trend in state jurisdictions during the nineteenth
century. While Justice Powell's criticism in Bretz that the Supreme Court ignored the pre-1791
history of double jeopardy jurisprudence in its own decisions possesses strong logical force, it must
be remembered that the earliest Texas double jeopardy provision did not appear until 1836, and the
current Texas provision was adopted in 1876. The Texas Constitution's "Johnny-come-lately" status
raises the possibility that the framers did consider the emerging jurisprudence in other states in
framing the Texas double jeopardy provision. 

 Moreover, the 1876 version reflects substantial alterations from the text originally contained
in the 1836 document, and for that matter, from the text of the counterpart provision contained in
the Fifth Amendment to the United States Constitution. That significant alterations of language are
present suggests that the framers of the Texas Constitution did not simply pattern the state double
jeopardy provision after its federal constitutional counterpart but gave independent thought to its
crafting. That the framers gave independent thought to the crafting of the provision suggests they
would also have been cognizant of the developing double jeopardy jurisprudence and likely crafted
the provision with that jurisprudence in mind.

 In 1836, the framers of the provision in the Republic of Texas Constitution would have had
available the Pennsylvania double jeopardy case that drew a connection between "jeopardy of life
or limb" and having the right to a jury trial "remain inviolate." While it might have been a
coincidence, the placement of these two protections in the same section of the Republic's
constitution appears to be unusual, especially given the fact that the Republic's constitution did
contain a separate provision patterned after the jury trial guarantee found in the United States
Constitution. (134) 

 Similarly, the addition of the words "or liberty" to the 1876 version of the state double
jeopardy provision could have been a reaction to Ex parte Lange, decided two years earlier. In
Lange, the United States Supreme Court decided that the federal double jeopardy protection
extended to all crimes, regardless of the severity of the contemplated punishment. (135) With "or
liberty," the framers of the Texas Constitution may have signaled their agreement with the notion
that the double jeopardy protection extended even to misdemeanors but at the same time expressed
minor disagreement with the Supreme Court's opinion by carving a very limited exception for crimes
that do not carry a risk of incarceration and for which the defendant was not acquitted by a verdict
of not guilty. If the Texas framers considered Lange in drafting the 1876 version of the double
jeopardy provision, that at least raises the possibility that they also considered the then-mushrooming
state jurisprudence regarding the application of double jeopardy to mistrials and the implication in
Lange itself that the double jeopardy protection might have some applicability in that context. 

 Of course, the 1856 code provisions and the decisions in Moseley and Taylor are evidence
to the contrary: both the Legislature and the Texas Supreme Court expressed the view that jeopardy
was not implicated by the premature termination of trial, and these views were expressed within a
relatively short time before the Constitution of 1876 was adopted. However, neither of these
developments survived Powell (decided within a relatively short time after the adoption of the
Constitution of 1876), which declared the code provisions unconstitutional and overruled the Texas
Supreme Court cases. 

 And neither of these earlier developments were unassailable on their own merits. The
Legislature may have revealed its own confusion regarding double jeopardy jurisprudence when it
indicated that the term "jeopardy" applied only when there was a prior conviction - a position that
clearly did not comport with English common law, which also applied the concept of "jeopardy" to
prior acquittals. Moseley (and Taylor, as it was based upon Moseley) grounded its decision in part
upon what we now know is a false dilemma: characterizing the issue as a choice between keeping
jurors together indefinitely until, induced by starvation, they issue a reluctant verdict, or, giving the
trial court absolute, unreviewable discretion to declare a mistrial with no attendant double jeopardy
consequences. The decision in Powell pointed to an approach between those extremes: give the trial
court discretion but allow review for abuse of discretion - a practice with which appellate courts are
now intimately familiar.

 The upshot of this discussion is that the applicability of the Texas double jeopardy provision
to mistrials depends upon the vitality of Powell, and we cannot say with any confidence that Powell
was wrongly decided, much less that the decision was flawed from the outset. At most, we can say
that the issue was disputable, and that Moseley and Powell each advanced reasonable positions. 
Even if we decided that Moseley's position was more likely correct as an historical matter, that
would not be sufficient to overturn a precedent that has existed unmolested for over 120 years.

 Nor do practical considerations counsel otherwise. The framework of barring retrial when
a mistrial has occurred without the defendant's consent and absent manifest necessity has proven to
be consistent and workable. While the framework does have its cost - allowing the occasional guilty
person to go free - it serves to protect defendants from multiple harassing prosecutions, an important
interest underlying the double jeopardy clause, and the exceptions of consent and necessity serve to
reasonably limit any adverse impact. In accordance with stare decisis, we decline to
overturn Powell's holding that the Texas double jeopardy provision, with exceptions, protects a
defendant against the premature termination of trial.

IV. DEFENSE-REQUESTED MISTRIALS


A. The Issues


 The State's contentions can be accurately sorted into four categories. First, the State attacks
the Bauder standard as inconsistent with the legal theory and purpose of the "mistrial species" of
double jeopardy protection. The State claims that the Bauder standard goes awry by operating as
a penal sanction against the prosecution rather than as a shield against a prosecutor's attempt to abort
a trial to prevent an impending acquittal. The State further claims that the penal nature of the
sanction conflicts with subsequent caselaw declining to accord double jeopardy effect to appellate
reversals. Second, the State attacks the opinion in Bauder as poorly reasoned. The State claims the
opinion failed to examine Texas history, law, or jurisprudence but arrived at its holding based solely
on the Court's subjective notion of "fairness." Third, the State contends that there is no historical
support for the standard announced in Bauder. The State points out that no Texas cases endorsed
the standard as a matter of state constitutional law before the United States Supreme Court applied
the federal double jeopardy clause to the states. And finally, the State contends that the Bauder
standard is too amorphous for practical application. The State claims that current Texas caselaw
reflects the confusion the standard has generated. 

B. Legal Underpinnings


1. Historical Developments


 The majority and concurring opinions in Bauder did not attempt to show that the framers of
the Texas Constitution intended the standard set forth by the Bauder decision. (136) Those opinions did
not cite legal materials (cases, treatises, statutes, etc.) preceding the framing of the 1876 constitution
that might have influenced the wording of the state double jeopardy provision or in some way
reflected the intent of the framers. (137) Nor did those opinions cite early Texas cases construing the
1876 provision. (138) In other words, Bauder did not conduct, with regard to the "recklessness"
standard, the kind of review we have conducted in part III regarding the mistrial question.

 Our research suggests that Bauder could not have been based upon such a review because
the supporting evidence simply does not exist. As discussed above, the nineteenth century cases
applying double jeopardy protection to the mistrial setting uniformly held that a defendant could be
tried anew if he had consented to the mistrial. The first time an exception to that principle appears
to have been mentioned in caselaw was in 1964 by the Supreme Court in United States v. Tateo. (139) 
In that case, the defendant claimed that he was deprived of an opportunity to obtain a verdict of
acquittal due to comments by the trial judge that coerced him into pleading guilty. (140) The Supreme
Court suggested that, had the defendant requested a mistrial on the basis of the judge's comments,
"there would be no doubt that if he had been successful, the Government would not have been barred
from retrying him," and further said it would be "strange" for the defendant "to benefit because of
his delay in challenging the judge's conduct." (141) In a footnote, the Court added, "If there were any
intimation in a case that prosecutorial or judicial impropriety justifying a mistrial resulted from a fear
that the jury was likely to acquit the accused, different considerations would, of course, obtain." (142)

 Two years later, in an early foreshadowing of the Kennedy standard, the Pennsylvania
Supreme Court suggested that double jeopardy would bar retrial after a defense-requested mistrial
if "the prosecution intentionally sought to infect the proceedings in order to abort the trial." (143) But,
in the case before it, the prosecutor's improper remarks "were not calculated to precipitate the
mistrial," and thus, the appellate court was not confronted with a case "in which the prosecution
invited the mistrial in order to secure another, possibly more favorable opportunity to convict the
accused." (144) The Pennsylvania Court would confront that case a year later in Commonwealth v.
Warfield, where, after the defendant's motion to suppress his confession was granted, the prosecutor,
in opening statement, told the jury that the defendant had made a confession to the police. (145) The
defendant immediately moved for a mistrial, and the trial court granted the motion. (146) The parties
agreed that the prosecutor's remark "was made for the specific purpose of causing a mistrial so that
a ruling might be obtained from the Supreme Court of Pennsylvania upon the correctness of the trial
judge's suppression of the confession." (147) The Pennsylvania Supreme Court held that retrial of the
first-degree-murder charge was barred by the state double jeopardy provision. (148) 

 In 1971, the United States Supreme Court suggested in dictum in a plurality opinion that
"where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion
by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if
the defendant's motion is necessitated by prosecutorial or judicial error." (149) In a footnote, the
Supreme Court stated as the "converse" proposition: "where a defendant's mistrial motion is
necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution
might well be barred." (150) 

 Without a clear, definitive holding to guide them, lower courts struggled to define the precise
contours of the rule suggested in dicta by the Supreme Court. The Fifth Circuit held that
prosecutorial error would result in a jeopardy bar to retrial after a defense-requested mistrial if the
error amounted to "gross negligence or intentional misconduct." (151) Other courts stated the rule
differently, encompassing "deliberate and intentional misconduct" (152) or conduct "designed to avoid
an acquittal." (153)

 In 1976, the Supreme Court handed down United States v. Dinitz, which held that a
defendant's motion for mistrial ordinarily removed any double jeopardy bar to retrial. (154) The Court
recognized an exception for "governmental actions intended to provoke mistrial requests and thereby
subject defendants to the substantial burden of multiple prosecutions." (155) Retrials would be barred
"where 'bad-faith conduct by judge or prosecutor' . . . threatens the '[harassment] of an accused by
successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable
opportunity to convict' the defendant." (156) With regard to the case before it, the Court held that the
conduct in question "was not done in bad faith in order to goad the respondent into requesting a
mistrial or to prejudice his prospects for an acquittal." (157) 

 The negative disjunctive in the preceding sentence, at least in isolation, raised an ambiguity
concerning whether the standard was met if the prosecutor intended (1) either to goad the defendant
into moving for a mistrial or to prejudice the prospect of acquittal, or (2) both to goad the defendant
into moving for a mistrial and to prejudice the prospect of acquittal. Taking the Supreme Court's
"application" statement in context with its abstract discussion of the law suggests the latter, but at
least one state court opinion interpreted it as the former. (158) The Supreme Court of Hawaii had an
even broader reading of the rule as protecting against "misconduct designed to avoid an acquittal,
or . . . deliberate misconduct which has for its intended purpose the denial of the defendant's
constitutional right to a fair trial." (159) Other courts, though, took the view that intent to provoke a
mistrial was an essential ingredient to relief on this type of claim. (160) However, while recognizing
a potential conflict with Dinitz, the Fifth Circuit nevertheless appeared to cling to its earlier "gross
negligence" articulation of the standard, (161) while several other courts, including our own, followed
the Fifth Circuit formulation without any apparent awareness of the conflict. (162) 

 Against this backdrop, the United States Supreme Court decided Oregon v. Kennedy. The
Court acknowledged that its previous cases had phrased the rule "with less than crystal clarity" and
that this state of affairs had caused confusion in the lower courts. (163) The Supreme Court then
adopted the current federal rule for reasons that we will discuss later. (164) This Court later recognized
the Supreme Court's clarification of the rule. (165)

 Since Kennedy was decided, only seven state high courts, including this Court, have adopted
a broader standard. (166) Various nuances appear in each of these decisions, but they can be sorted 
roughly into three categories: (1) the "fair trial" approach, followed by Pennsylvania and Hawaii, (167)
(2) permitting a lesser culpable mental state with respect to the occurrence of the mistrial, followed
by Oregon, Arizona, Texas and New Mexico, (168) and (3) the "intent to avoid an acquittal" approach,
followed by California. (169) Ironically, the Arizona and Pennsylvania holdings represented a departure
from the previous adoption of a standard essentially identical to the one espoused in the Oregon v.
Kennedy case before Oregon v. Kennedy had been decided. (170) 

 As the present discussion shows, the rule according double jeopardy consequences to a
defense-requested mistrial (under certain limited circumstances) was a relatively recent innovation. 
There was no authority in any jurisdiction for such a rule at the time the Texas Constitution of 1876
was adopted, despite the fact that there existed at the time numerous authorities applying double
jeopardy protections to the mistrial context in general (but only when the defendant did not consent
to a mistrial). When this Court originally adopted the rule, it did so in response to federal
jurisprudence rather than as an effort to independently construe our state's own double jeopardy
protection. 

2. Purpose of the Mistrial Double Jeopardy Protection 


 Absent any reason to believe the framers of the Texas Constitution intended for the double
jeopardy protection to apply to a defense-requested mistrial, why recognize a rule in that context at
all, however narrowly the rule is crafted? The answer must be that the posited circumstances show
the defendant's consent to a mistrial to be a sham. In Kennedy, the Supreme Court held that the
defendant's valued right to complete his trial before the first jury would be a "hollow shell" if retrial
were permitted after the prosecution, through its conduct, intentionally precipitated a mistrial. (171) 
According to the Court, it is not enough, however, that the defendant faced a "Hobson's choice"
between giving up his first jury and continuing with a tainted trial. (172) Rather, the question is whether
the defendant retained primary control over the course to be followed. (173)

 The Bauder Court claimed that situations encompassed by its "recklessness" standard were
"constitutionally indistinguishable" from those encompassed by the specific-intent standard of
Oregon v. Kennedy, (174) but the Court's justifications for that contention fall short. With no authority
whatsoever, the Bauder Court contended that "the right to a trial before the jury first selected is the
right to a fair trial before that jury." (175) That statement, however, conflates the double jeopardy
protection with more generalized notions of due process and due course of law. As the California
Supreme Court has recognized, "[D]ouble jeopardy is neither another form of due process protection
ensuring the propriety of the criminal trial nor a means to protect against outrageous government
conduct." (176) The "remedy of a new trial" is "sufficient to vindicate both the citizen's interest in a
fair trial and the societal interest in bringing those properly found guilty to punishment." (177) The
question, for double jeopardy purposes, is not whether the defendant's trial was "fair" but whether
requesting a mistrial was ultimately his decision. (178) The Bauder Court suggested that a defendant's
decision in a "recklessness" situation would not be a "free" decision, (179) but the question is not
whether the decision was "free" in the sense of being unconstrained but whether the decision was
his own, albeit in the face of a dilemma. (180) To say that the decision was not the defendant's own is
to say that the decision was in reality made by someone else, e.g. the prosecutor. But when a
prosecutor is merely reckless, one cannot say the prosecutor has made the decision to seek a mistrial. 
Only when the prosecutor intends to provoke the defendant's mistrial motion can it be said that the
prosecutor, rather than the defendant, has exercised primary control over the decision to seek the
trial's termination. 

 The Bauder Court also claimed that, for double jeopardy purposes, the distinction between
intent and recklessness was "fuzzy and imponderable," and the Court did "not believe that the
purpose of the constitutional right here in issue really has anything to do with the prosecutor's
intent." (181) But actually, the distinction between the two culpable mental states is clear, and the
requirement of intent is important. As discussed above, whether the prosecutor intends to bring
about a mistrial is critical to determining whether he, rather than the defendant, has exercised
primary control over whether a mistrial is sought. In addition, the different culpable mental states
reflect different purposes of the prosecutorial misconduct, and those different purposes are important
in the double jeopardy context. As discussed in part III, one of the common threads of the nineteenth
century double-jeopardy mistrial cases was that the declaration of mistrial, without necessity or the
defendant's consent, constituted an implied, or virtual, acquittal. When the prosecutor's purpose
is to produce a mistrial, he has, in essence, sought that acquittal. But when the prosecutor's purpose
is to produce a conviction, even at the substantial risk of mistrial, the prosecutor has not sought an
acquittal.

 One method of bringing the distinction into focus is to ask what happens if the prosecutor
succeeds in his purpose. Under the Kennedy standard, a prosecutor who succeeds in causing a
mistrial also succeeds (presumably to his dismay) in barring further prosecution. To be consistent,
one would expect, under the Bauder standard, that a prosecutor who succeeds in obtaining a
conviction through his reckless conduct would also be faced with a double jeopardy bar to retrial
when that conviction is overturned, because of that conduct, pursuant to a post-verdict motion for
new trial or on appeal. Indeed, the five other jurisdictions recognizing a broader rule than that
articulated in Oregon v. Kennedy that have addressed the issue (182) have expressed the view that the
rule applies even when a mistrial was not granted, a verdict was obtained, and the case was
overturned at a subsequent stage of the proceedings. The lead cases in Pennsylvania and Hawaii
actually involved convictions that were reversed on appeal (183) while the New Mexico case involved
a post-verdict motion for new trial. (184) In a later case, the Arizona Supreme Court extended its own
rule to appellate reversals. (185) And while we have not found an Oregon decision applying the rule to
a case that proceeded to verdict, the original statement of the rule - referring to the "resulting
mistrial or reversal" - strongly suggests that it does. (186) 

 Under this Court's subsequent cases - Ex parte Davis and Ex parte Mitchell - retrial is not
barred under the Texas Constitution if the case proceeds to verdict and is overturned later, on
appeal. (187) This is so because the defendant "was not denied his right under the double jeopardy
clause to have the charges against him tried to a verdict before the first tribunal." (188) So, if the
reckless prosecutor succeeds (in obtaining a conviction through dubious means), then in Texas no
double jeopardy bar arises. But, if the reckless prosecutor fails, because a mistrial is declared, then
the defendant obtains greater relief, a bar to future prosecution, than he would have obtained if the
prosecutor had achieved his purpose. Thus far, Texas appears to be the only jurisdiction adopting
this illogical position.

C. Practical Considerations


1. The Kennedy Standard


 In Kennedy, the Supreme Court criticized as too vague certain proposed general standards
for determining what type of prosecutorial conduct should result in a jeopardy bar after a mistrial on
the defendant's motion. It found that standards such as "bad faith," "harassment," and
"overreaching" offered "virtually no standards for . . . application." (189) "By contrast," the Court said,
"a standard that examines the intent of the prosecutor, though certainly not entirely free from
practical difficulties, is a manageable standard to apply. Inferring the existence or nonexistence of
intent from objective facts and circumstances is a familiar process in our criminal justice system." (190)

 The Bauder Court suggested, however, that the "intent" standard was inadequate because it
was too difficult to distinguish between intent and recklessness with respect to a prosecutor's
culpable mental state regarding the occurrence of a mistrial. (191) In support of this claim, the Court
contended, "we do not perceive a distinction of constitutional significance between conduct of
prosecuting attorney in which he intends to cause a mistrial and conduct of a prosecuting attorney
which he is aware is reasonably certain to result in a mistrial." (192) But, as an examination of our own
Penal Code illustrates, "reasonable certainty" is the hallmark of a "knowing" mental state and is
quite different from the "substantial risk" standard of recklessness. (193) The Court claimed that the
distinction between culpable mental states was "far too insensitive a criterion for decision in these
cases," but the Court's conclusion seems to reflect its own confusion regarding which mental state
it was really talking about.

 In his concurring opinion, Judge Baird offered a more straightforward statement of what the
Court may have really been concerned with: that intent to cause a mistrial would be "virtually
impossible to prove." (194) In this vein, Judge Baird commented that his independent research "failed
to reveal even a single case where the Kennedy burden was met." (195) Our research of high state court
opinions has uncovered seven, five of which were in published opinions before Bauder was
decided. (196) One of the seven cases is Warfield, which, as we have already discussed, presciently
anticipated the standard before Kennedy was decided, but the other six cite Kennedy and follow it. (197) 
In two of the seven cases, the State conceded the prosecutor's intent, (198) while the other five involved
a trial court finding that the prosecutor intended to cause a mistrial. (199) In all seven cases, a finding
of the requisite intent was supported by the record. (200)

 Obviously, obtaining relief under the Oregon v. Kennedy standard is rare. That is
understandable, however, when one considers that prosecutors do not ordinarily attempt to "throw"
their cases, even when problems are encountered. Moreover, the double jeopardy sanction renders
such conduct self-defeating.

 And while we are not aware of any decisions granting relief under Kennedy where the
proceedings contain neither a state concession nor a favorable trial court finding, the absence of any
such cases does not necessarily point to any inadequacy in the standard. For questions that are highly
fact-intensive, the prevailing party has a significant advantage in the appellate forum, and if the
prevailing party is not the one charged with the burden of proof, the advantage may be especially
great. (201) That, however, is the nature of the system, where the trial proceedings are the "main event,
rather than a tryout on the road." (202) Trial courts are in the best position to determine whether a
prosecutor's conduct evinces an intent to cause a mistrial, and Texas provides defendants with the
opportunity to litigate the question in the trial forum (before the second trial), (203) and even before a
jury (on retrial). (204)

 Finally, one should expect that such an extreme remedy - what is essentially an acquittal, "the
greatest form of relief in the criminal system" (205) - invoked under the most inhospitable of
circumstances - a request for relief as a result of an action the requesting party procured, which would
ordinarily give rise to estoppel (206) - would be difficult to obtain and would seldom be granted. 

2. The Bauder Standard


a. Inception


 The Bauder Court suggested that its standard would have "practical advantages" because it
was "less subjective." (207) But, as this Court would later recognize in Peterson II, the proffered
"recklessness" standard turned on the prosecutor's mental state just as much as Kennedy's intent
standard, and therefore was "no less subjective." (208) The former was more lenient, and thus, would
at least seem easier to meet, but "easier" in this context is not necessarily "better." Our later opinion
suggested that the "more objective" rationale might carry some force "if trial and appellate courts
focus primarily upon the objective facts and circumstances of the prosecutor's conduct and the events
which led to that conduct." (209) But, as discussed above, the Supreme Court had previously recognized
in Kennedy under its own standard that intent could be assessed in light of the "objective facts and
circumstances." (210) The Bauder standard simply offers no advantage in this respect.

 As a well-recognized culpable mental state, "recklessness" would at least seem to be
reasonably specific, avoiding the Supreme Court's criticism of a generalized "overreaching" standard,
but the Bauder formulation did not completely adhere to the familiar definition found in the Penal
Code because it did not require that the "risk" be a "substantial" one. (211) Even if that element were
implied, confusing language in the Bauder opinion suggested that the standard's application would
not be that simple. Statements by the Court that the defendant's right to a "fair trial" was an
important consideration, that the prosecutor's specific intent was "irrelevant," that the double
jeopardy question might turn on whether the prosecutor was "reasonably certain" that a mistrial would
result, and that the rule formulated was somehow "less subjective" than one that turned on specific
intent all suggested that the standard would be more complex than simply evaluating whether the
prosecutor was reckless with regard to whether a mistrial would occur. (212) 

 The Bauder opinion also contained language that actually suggested that granting a
defendant's requested mistrial would usually result in a double jeopardy bar. It did so by emphasizing
that "trial conditions must be extreme before a mistrial is warranted in Texas," that "[a]ccordingly,
the line between legitimate adversarial gamesmanship and manifestly improper prosecutorial methods
should be difficult for most prosecuting attorneys to cross unless they do it on purpose," and that
crossing that line, "either deliberately or recklessly," results in a bar to further prosecution. (213) Such
a statement harkens back to the generalized "overreaching" standard that the Supreme Court warned
against and turns double jeopardy jurisprudence on its head by making jeopardy preclusion from a
defense-requested mistrial a common occurrence rather than the rare exception. That was probably
not the Court's intent, but the language was there, a trap waiting to be sprung by an unwary trial or
intermediate appellate court.

 Setting aside confusing language in the Bauder opinion, the recklessness standard poses some
practical problems in this context. "Every act on the part of a rational prosecutor during a trial is
designed to 'prejudice' the defendant" in front of the jury so that it will convict him. (214) The prejudice
should be fair rather than foul, but in the heat of battle, prosecutors may overstep their bounds. While
a prosecutor clearly knows he should not try to cause a mistrial, he may be a lot less certain what
conduct an appellate court would decide carried a substantial risk of a mistrial that the prosecutor is
then found to have consciously disregarded. In his dissent, Presiding Judge McCormick doubted that
prosecutors would "know with any certainty what conduct is prohibited by this rule." (215)

 Another concern is that a broad standard is likely to unduly deter the granting of mistrials
when otherwise warranted by the circumstances because a trial judge would rather leave the decision
to reverse to an appellate court than create a situation that would forever bar prosecution of a
defendant who may well be guilty. (216) In Kennedy, the Supreme Court isolated two ways in which a
defendant could be harmed as a result: (1) the defendant loses "some of the advantages" secured to
him" by the double jeopardy protection because, even if he ultimately obtains an appellate reversal,
he will be subject to additional time, expense, and anxiety that might have been avoided by obtaining
a mistrial, and (2) the defendant fails to obtain any relief at all (which he would otherwise have
obtained through a mistrial) because of the appellate courts' practice of deferring to trial court
rulings. (217) As discussed earlier, most jurisdictions that have adopted a broader rule have taken the
logical step of extending the double jeopardy sanction to appellate reversals, which to some extent
ameliorates this concern. If the defendant obtains relief on appeal that he should have obtained by
mistrial, he will receive the same double jeopardy protection. At least theoretically, the trial court
may have less incentive to deny a meritorious mistrial motion since the double jeopardy consequences
of mistrial and appellate reversal are the same. But practically, the trial court would understand that
its decision to grant or deny the mistrial might affect the appellate court's determination regarding
the flagrancy of the misconduct, and so these jurisdictions do not completely escape the issue. Of
course, in Texas, the concern applies with full force because, due to Davis and Mitchell, the trial court
does know that reversal on appeal carries none of the double jeopardy risks of granting a motion for
mistrial. This problem is similar to that posed by the disparate treatment under Texas law of
punishment errors at the motion for new trial stage and on appeal, and a trial court's refusal to grant
a new trial on the basis of punishment error (and our upholding of that refusal) (218) comports with the
type of conduct foreseen by the Supreme Court in Kennedy. But the problem is even worse here
because, the more egregious the prosecutorial misconduct, the greater the incentive the trial court has
to ensure the completion of the trial to avoid a double jeopardy bar.

b. Subsequent Cases


 Problems with applying the Bauder standard began with this Court's remand in Bauder itself. 
In explaining the recklessness standard, one passage in this Court's opinion stated: "Under this rule,
the prosecutor is not accountable for mistrials when the trial judge need not have granted the
defendant's motion." (219) On remand, the San Antonio Court of Appeals concluded that this sentence
created the first prong of a two-prong test: (1) whether the motion needed to be granted, and (2)
whether the prosecutor's conduct was intentional or reckless. (220) The court of appeals further
concluded that this first prong concerned "whether the trial court would have abused its discretion
if it had denied [the] motion for mistrial" which in turn required determining "whether any reasonable
view of the record supports not granting the mistrial." (221) After discussing the trial incident that led
to the mistrial, a police witness's description of the defendant engaging in a sex act in response to a
prosecutor's question about what the officer observed at a certain location, the appellate court held
that the trial court did not have to grant the motion for mistrial because any harm flowing from the
testimony could have been cured by an instruction to disregard. (222) The court of appeals did express
some concern that this Court's holding required it to ignore the trial court's findings. (223)

 The defendant petitioned for review, and this Court decided that the Court of Appeals applied
the wrong standard: "The question is not the correctness of the ruling granting the mistrial. The
question under the Double Jeopardy Clause is whether the defendant truly consented to the
mistrial." (224) Quoting from the Supreme Court cases in Jorn, Dinitz, and Kennedy, and from this
Court's earlier decision in Bauder, this Court held in Bauder III that the issue was whether the
defendant's motion for mistrial was "made in response to ordinary reversible error" or was "required
. . . because the prosecutor deliberately or recklessly crossed 'the line between legitimate adversarial
gamesmanship and manifestly improper methods' . . . that rendered the trial before the jury unfair to
such a degree that no judicial admonishment could have cured it." (225) Consequently, this Court
reversed the court of appeals's decision in Bauder II and remanded for reconsideration. (226) Judge
Baird concurred, expressing "fear that the majority opinion potentially blurs the critical distinction
between mistrials granted in response to 'ordinary' reversible error and those granted because of
'prosecutorial overreaching.'" (227) Judge Keller dissented, arguing that the standard articulated by this
Court in Bauder III did not appear to differ materially from the standard applied by the court of
appeals in Bauder II. (228)

 On the second remand, the court of appeals acknowledged Bauder III and proceeded to
address the double jeopardy question for a third time. (229) This time, the court discussed evidence that
the prosecutor was surprised by the witness's response to his question. (230) Consequently, the court
concluded that the prosecutor had not been aware of a risk that an event for which he was responsible
would cause a mistrial and had not "deliberately or recklessly crossed the line between legitimate
adversarial gamesmanship and manifestly improper methods." (231) In a footnote, the intermediate
appellate court reiterated its belief that the mistrial was unnecessary because an instruction to
disregard would have cured the error, and it expressed perplexity at what it saw to be conflicting
statements on the matter by this Court in Bauder III. (232) Affirming the trial court's denial of habeas
relief, the court of appeals finally succeeded in ending Bauder's appellate orbit. (233)

 Before Bauder III was decided, the Dallas Court of Appeals handed down a decision in State
v. Lee. (234) In that case, tried in October 1995, a mistrial was granted after the prosecutor said in
opening statement that the defendant had told a police detective that he did not want to talk to him
and that the detective should contact the defendant's lawyer. (235) When the State sought to retry the
case, the defendant filed a habeas action, and in December 1995, the trial judge denied relief. But,
the defendant subsequently filed a motion to reconsider in light of Bauder, and the trial judge
thereafter granted relief, dismissing the prosecution. (236) Relying upon Bauder II, the court of appeals
held that the double jeopardy analysis entailed a two-step process: (1) whether the mistrial was
"properly granted," and (2) whether the mistrial was "made necessary by the deliberate or reckless
conduct of the prosecutor." (237) The Lee court expressed concern about the first prong because "many
times, because of concern for an accused's right to a fair trial, a trial judge will err on the side of
caution and grant a mistrial. Many considerations factor into this decision and many of them cannot
be adequately reflected in the record." (238)

 The appellate court nevertheless proceeded to the first prong, holding that it would be met if
it were shown that error was committed and the error could not be cured by an instruction to
disregard. (239) Finding the prosecutor's statement to be a comment on the right to counsel in violation
of caselaw and Article 38.38 of the Code of Criminal Procedure and finding that the comment "could
well have shaped the jury's entire view" of the defendant and the case, the appellate court concluded
that incurable error had occurred. (240) With regard to the second prong, the court of appeals concluded
that the trial court was within its discretion to believe that the experienced prosecutor, although not
intending to cause a mistrial, was reckless with regard to whether her comment would require a
mistrial at the defendant's request. (241)

 The State petitioned for review, and this Court reversed (Lee II). (242) First, this Court
determined that the prosecutor's statement was properly characterized as a comment on the right to
silence rather than the right to counsel. (243) Second, the Court determined that the appropriateness of
the type of comment at issue - on pre-arrest, pre-Miranda silence - was a question of first impression
in Texas and was unsettled in the federal system. (244) Finally, the Court concluded that, in view of the
"state of the law, the prosecutor's actions could not have been intentional or reckless." (245)

 In explaining that conclusion, the Court offered what can only be described as a troubling
array of definitions of "intentional" and "reckless" conduct. According to the opinion, a prosecutor
engages in "intentional" conduct when:

(1) believing that he cannot obtain a conviction under the circumstances with which
he is confronted, and given the admissible evidence then at his disposal, deliberately
offers objectionable evidence which he believes will materially improve his chances
of obtaining a conviction, and the law considers the prejudicial effect of such
objectionable evidence to be incurable even by a firm judicial admonishment to the
jury


or . . .


(2) the objectionable conduct of the prosecutor was intended to induce a motion for
mistrial. (246) 


The first definition of "intentional" conduct is not a definition of the "intent" standard found in
Oregon v. Kennedy, nor does the definition clearly fall within the "recklessness" standard found in
Bauder. Rather, the so-called definition appears to be from language in Bauder that took on a life of
its own. The Court also offered three definitions of the "reckless" standard:

(1) the prosecutor was aware but consciously disregarded the risk that an objectionable
event for which he was responsible would require a mistrial at the defendant's request,


(2) he is aware his conduct is reasonably certain to result in a mistrial, or . . .


(3) he is aware that his conduct creates a risk that a mistrial is reasonably certain to
occur, but consciously disregards that risk. (247)


Although all three of these formulations were derived from language in Bauder, only the first seems
to comport with the original standard, but, as with the original formulation, it does not require the risk
to be "substantial" and, therefore, is not the definition of "reckless" as traditionally understood in
Texas. The second definition appears to be a "knowledge" standard, rather than one of
"recklessness," while the third appears to be some sort of hybrid between the two culpable mental
states. 

 After this Court's decision in Lee II, the Dallas Court of Appeals confronted another Bauder
claim in Ex parte Peterson. (248) In that case, the prosecutor elicited testimony that the trial court
believed was barred as a result of a discovery violation. (249) Although the prosecutor contended at trial
that she believed the matter was contained in an offense report the defendant had timely received, the
trial court granted the defendant's motion for mistrial "to give [the prosecutor] another opportunity
to give discovery to the defendant." (250) However, the defendant later filed a pre-trial habeas
application, alleging double jeopardy, which the trial court granted. (251)

 The Dallas Court of Appeals affirmed, concluding that the prosecutor had "deliberately or
recklessly cross[ed] the line between legitimate adversarial conduct and manifestly improper
methods" and that the trial judge could have concluded that the error was incurable. (252) In its
discussion, the court of appeals relied upon the array of definitions recited in Lee II. (253) The court
explained that "the prosecutor knew the tapes were 'severely damaging' to [the defendant] and that
admission of the tapes 'would have substantially increased the State's chances of securing a
conviction.'" (254)

 We vacated that decision in Peterson II. (255) Acknowledging that the Bauder standard "has
not always proven easy to apply," (256) we proceeded to "clarify the standards" under which the Texas
double jeopardy protection could be invoked. (257) We set forth a three-pronged test: 

(1) Did manifestly improper prosecutorial misconduct provoke the mistrial?


(2) Was the mistrial required because prejudice produced from that misconduct could
not be cured by an instruction to disregard? and


(3) Did the prosecutor engage in that conduct with the intent to goad the defendant
into requesting a mistrial (Kennedy standard) or with conscious disregard for a
substantial risk that the trial court would be required to declare a mistrial (Bauder
standard)? (258)


We also gave a nonexclusive list of factors to consider in evaluating cases under the third prong of
the test: (1) whether the trial was "going badly for the State," (2) whether the misconduct was
repeated despite admonitions from the trial court, (3) whether the prosecutor provided a reasonable,
"good faith" explanation for the conduct, (4) whether the conduct was "clearly erroneous," (5)
whether there was a legally or factually plausible basis for the conduct, and (6) whether the
prosecutor's actions leading up to the mistrial were consistent with inadvertence, lack of judgment,
or negligence, or instead, were consistent with intentional or reckless misconduct. (259)

 The Court's opinion in Peterson II obviously went to great lengths to clarify the messy
jurisprudence flowing from Bauder. It brought the standard closer to true recklessness by explicitly
requiring that the "risk" be "substantial," implicitly jettisoned various other confusing formulations
of the "intent" and "recklessness" standards articulated in Lee II, clarified that the error in question
must have been incurable, and sought to establish a clear framework by formulating a three-pronged
approach and suggesting a number of relevant factors to consider with regard to the third prong,
which it considered to be "the most problematic." (260) But the Court's candid admission that the
Bauder test was "no less subjective" than the intent test articulated in Oregon v. Kennedy led Judge
Hervey to say that the Bauder holding has "been transformed into a made-up constitutional rule in
search of a rationale to justify its existence." (261) And despite the attempted clarifications, Judge
Keasler still maintained that the Bauder rule is "ill-conceived, historically unsound, and imprecise." (262) 
Judge Hervey also concluded that the attempted clarification was ultimately futile: "Instead of
pursuing a quixotic attempt to clarify this jurisprudence, the Court should reexamine it." (263) Despite
the new prongs and factors, Judge Hervey said, the Bauder standard "will continue to be difficult to
apply and will do little to promote (if not actually frustrate) the interests protected by double jeopardy
principles." (264)

 Courts from other jurisdictions have mounted similar criticisms of the Bauder standard. The
Supreme Court of Connecticut complained that the tests in jurisdictions recognizing a standard
broader than found in Oregon v. Kennedy, "with the possible exception of California, lack the
requisite clarity to achieve an optimal balance between the defendant's double jeopardy rights and
society's interest in enforcing criminal laws." (265) And the Supreme Court of California, while
contending that the Oregon v. Kennedy standard did not completely protect the interests underlying
California's double jeopardy provision, found the recklessness/willfulness/indifference standards,
such as the one articulated in Texas, to be "less than satisfactory, because none articulates the precise
double jeopardy basis for a conclusion that the principles underlying a defendant's double jeopardy
interest have been violated." (266) Consequently, the California Supreme Court concluded that "as
applied to different factual settings, each test improperly may mandate double jeopardy relief (that
is, barring any trial) for instances of prosecutorial misconduct that more appropriately should be
remedied by reversal and retrial." (267)

 One indication that these criticisms are on target is that we have more cases pending before
us. On remand from Peterson II, the Dallas Court of Appeals analyzed the case under the Peterson
II framework and concluded that habeas relief should be denied, and that case has not again come
before us. (268) However, three other Bauder cases, including the present one, were pending before us
during the past year. In Ex parte Wheeler and the present case, the trial courts denied relief, the courts
of appeals reversed and granted relief, we vacated the courts of appeals's decisions in light of
Peterson II, and the courts of appeals maintained their position that relief should be granted. (269) In
State v. Masonheimer, the trial court granted relief, but the court of appeals reversed, holding that
relief should be denied. (270) We granted petitions for discretionary review in all three cases. Recently,
we issued an opinion in Wheeler, concluding that the court of appeals had erred in granting relief
because the evidence supported the habeas trial court's finding that the prosecutor did not possess the
culpable mental state required for a double jeopardy violation. (271)

 If we were discussing a standard that "acquire[d] content only through application," such as
"reasonable suspicion" to conduct a stop, (272) or even a standard that is expected to be utilized in many
cases, we would not be surprised that the high court of a state would be called upon numerous times
to clarify and expound the standard's meaning and reach. But the type of standard at issue is one that
should very rarely be implicated, so the frequency with which we are called upon to construe the
standard points to a problem with the standard itself. 

 One problem seems to be that the Court has never really been able to describe adequately what
it believes double jeopardy should protect that is not already protected under Oregon v. Kennedy. The
recklessness standard in Bauder appears to have been only an approximation, and in subsequent
cases, the Court has added conditions (e.g. conduct improper from an objective standpoint, harm
flowing from conduct not amenable to cure) that it has believed made the approximation closer, but
it never quite gets to the unarticulated (and unarticulable) ideal that the Court seems to have been
striving for. To be sure, we have suggested that these other conditions also attach to the Kennedy
standard, but the United States Supreme Court has not said so. (273) It may be that these conditions do
indeed attach, but it has never been necessary to say that they do because, when the prosecutor
actually intends to provoke a mistrial, the other conditions will almost certainly be present. But when
the standard varies from the Kennedy "intent to provoke a mistrial" test, other conditions must be
expressly added "to guard against an unwarranted imposition of the double jeopardy bar." (274)

 The problem is that the refinement never seems to end. If we continue down the Bauder
path, we must either accept at some point that some defendants who are not entitled to a double
jeopardy acquittal will nevertheless obtain one under the Bauder standard, or we must continually
refine the standard to reach for that elusive unarticulated ideal - overturning every grant of relief
under Bauder along the way except on the rare occasion when relief would also be supported by
Oregon v. Kennedy. The simple explanation for the never-ending path toward this "separate" state
constitutional ideal is that it does not exist, because the real ideal is the Oregon v. Kennedy standard. 
 D. Evaluation


 The Bauder opinion was flawed in a number of respects. It was not based upon an historical
understanding of double jeopardy available to the framers of the Texas Constitution, and the standard
it formulated does not accurately reflect the purposes of the double jeopardy protection. The
opinion's justifications for the new standard were faulty, and the standard, as articulated, was
confusing. Practical difficulties in applying the standard have followed. Trial courts and courts of
appeals have had difficulty correctly interpreting and applying the Bauder standard to various fact
situations, and this Court has struggled to clarify it. Further, the Bauder standard conflicts logically
with this Court's treatment of appellate reversals in Davis and Mitchell, and partly as a result,
undoubtedly carries the risk of unduly discouraging trial courts from declaring mistrials when
warranted. And, the conflict between Bauder and Davis/Mitchell is relevant not only for its practical
consequences but also as a conflict in legal precedents that must be resolved. By contrast, the
Kennedy standard is workable, appropriately narrow, and comports with the purpose of the double
jeopardy provision's application to the mistrial setting. Consequently, we overrule Bauder and its
progeny (Bauder III, Lee II, Peterson II). As a matter of state constitutional law, we adopt the
standard articulated by the United States Supreme Court in Oregon v. Kennedy for determining when
to grant double jeopardy relief after a defense-requested mistrial, and we reaffirm the holdings in
Davis and Mitchell.

 The judgment of the Court of Appeals is reversed, and the case is remanded for analysis of
appellant's claim under the standard articulated in Oregon v. Kennedy.

Date delivered: January 10, 2007

Publish
1. 456 U.S. 667, 679 (1982).
2. 921 S.W.2d 696, 699 (Tex. Crim. App. 1996).
3. We granted three grounds for review:


(1) Should this Court reconsider its decision in Bauder v. State, 921 S.W.2d 696
(Tex. Crim. App. 1996)?


(2) Is the mere showing that a prosecutor recklessly engaged in conduct that
required the declaration of a mistrial, without showing that the prosecutor
intended to induce such mistrial, sufficient to order a double jeopardy bar to
reprosecution for that offense?


(3) Did the Court of Appeals correctly apply the Bauder standard?


Due to our disposition of the first two grounds, we dismiss the State's third ground for review. 
4. See Miranda v. Arizona, 384 U.S. 436 (1966).
5. Ex parte Lewis, 165 S.W.3d 376, 380 (Tex. App.-Fort Worth 2005)(brackets in
original).
6. Id. at 381 (brackets in original).
7. Id. (brackets in original).
8. Id. at 380-381.
9. Id.
10. Id.
11. Id. at 381.
12. Id. at 381-392 (evaluating the case under Ex parte Peterson, 117 S.W.3d 804 (Tex.
Crim. App. 2003)(hereinafter referred to in the body of this opinion as Peterson II)).
13. Id. at 392.
14. Malik v. State, 953 S.W.2d 234, 236 (Tex. Crim. App. 1997).
15. Jordan v. State, 54 S.W.3d 783, 786 (Tex. Crim. App. 2001).
16. Jordan; Bawcom v. State, 78 S.W.3d 360, 363 (Tex. Crim. App. 2002).
17. Malik.
18. Bawcom; Awadelkariem v. State, 974 S.W.2d 721, 725 (Tex. Crim. App. 1998).
19. Bawcom (unjust results and unnecessary burdens); Jordan (same); Malik
(unanticipated results).
20. Jordan.
21. Bauder, 921 S.W.2d at 706 n. 5 (McCormick, P.J., dissenting); State v. Lee, 15 S.W.3d
921, 928-929 (Tex. Crim. App. 2000)(Keasler, J., dissenting)(Lee II); Peterson, 117 S.W.3d at
826-827 (Hervey, J., dissenting).
22. See Hulit v. State, 992 S.W.2d 431 (Tex. Crim. App. 1998).
23. Id. at 437 ("The state constitution and the federal constitution are not parts of one legal
building; each has its own structure. Their shapes may be different, as may their parts. Each
may shield rights that the other does not. The ceiling of one may be lower than the floor of the
other.").
24. 437 U.S. 28, 40-49 (1978)(Powell, J., dissenting).
25. 336 U.S. 684 (1949).
26. 117 S.W.3d at 827 (Hervey, J., dissenting).
27. Peterson, 117 S.W.3d at 827 (Hervey J., dissenting); Lee, 15 S.W.3d at 928 (Keasler,
J., dissenting).
28. Bauder, 921 S.W.2d at 706 n. 5 (McCormick, P.J., dissenting).
29. Id. (emphasis in original).
30. U.S. Const., Amend. V.
31. United States v. Wilson, 420 U.S. 332, 340 (1975); Hoffman v. State, 20 Md. 425, 433
(1863); People v. Goodwin, 18 Johns 187, 202 (N.Y. 1820).
32. Bretz, 437 U.S. at 33 (Court's opinion).
33. Id. at 41 (Powell, J., dissenting).
34. Id.
35. Wilson, 420 U.S. at 340-342; Bretz, 437 U.S. at 40-41 (Powell, J., dissenting).
36. Stephen N. Limbaugh, Jr., The Case of Ex Parte Lange (or How the Double Jeopardy
Clause Lost Its "Life or Limb"), 36 Am. Crim. L. Rev. 53 (1999).
37. Goodwin, 18 Johns at 201; Hare v. State, 5 Miss. 187, 199 (1839); State v. Elden, 41
Me. 165, 169 (1856); Fay v. Parker, 53 N.H. 342, 386 (1872); Andrews v. State, 174 Ala. 11, 47,
56 So. 998, 1010 (1911).
38. Bretz, 437 U.S. at 41 (Powell, J,. dissenting).
39. Id. at 36 (Court's opinion).
40. Id. at 36 n. 13.
41. Id.; Commonwealth v. Cook, 6 Serg. & Rawle 577, 580 (Pa. 1822)(opinion of
Tilghman, C.J.).
42. Cook.
43. Bretz, 437 U.S. at 42 (Powell, J., dissenting).
44. Id. at 41-43.
45. Id. at 41-42.
46. Id. at 43.
47. Id. at 33 (Court's opinion).
48. State v. Garrigues, 2 N.C. 241, 241-242 (1795).
49. Id. 
50. Goodwin, 18 Johns at 200-206; Wyatt v. State, 1 Blackf. 257, 257 (Ind. 1823); Nugent
v. State, 4 Stew. & P. 72 (Ala. 1833); Commonwealth v. Fells, 36 Va. 613, 619 (1838); Price v.
State, 36 Miss. 531, 543-544 (1858); Hoffman, 20 Md. at 432-433; People v. Shotwell, 27 Cal.
394, 398-399 (1865); O'Brian v. Commonwealth, 69 Ky. 563, 569 (1869). 
51. In the matter of Spier, 12 N.C. 491 (1828). North Carolina's state constitution
contained no "double jeopardy" provision, but as Garrigues and Spier illustrate, it was
considered a venerable principle of the common law of that state. The North Carolina Supreme
Court would later say that the principle rested on the authority of the Fifth Amendment to the
United States Constitution "which being a part of the supreme law of the land, is obligatory on
all judicial tribunals, whether state or federal," or "if it be not accepted as resting on this basis, it
may at least be agreed, that it is a principle of the common law, and as such, of the same force in
our state as if made authoritative by our own state constitution." State v. Davis, 80 N.C. 384, 387
(1879). 
52. Cook, 6 Serg. & Rawle 577; State v. Waterhouse, 8 Tenn. 278 (1827); State v. M'Kee,
17 S.C.L. (1 Bailey) 651 (S. C. 1830); Mount v. State, 14 Ohio 295 (1846). 
53. Weinzorpflin v. State, 7 Blackf. 186, 189-193 (Ind. 1844); People v. Webb, 38 Cal. 467
(1869); O'Brian v. Commonwealth, 72 Ky. 333 (1872)(the same case, after retrial, as cited in
footnote 51); Teat v. State, 53 Miss. 439 (1876). 
54. Ex parte Maxwell, 11 Nev. 428, 434 (1876).
55. Cook, 6 Serg. & Rawle at 596-597 (opinion of Duncan, J.)("There is a wide difference
between a verdict given, and the jeopardy of a verdict. Hazard, peril, danger, jeopardy of a
verdict, cannot mean a verdict given. Whenever the jury are charged with a prisoner, where the
offense is punishable by death, and the indictment is not defective, he is in jeopardy of his life.");
Spier, 12 N.C. at 502 (opinion of Taylor, C.J.)("'Twice put in jeopardy' and 'twice put on trial,'
convey to the mind several and distinct meanings, for we can readily understand how a person
has been in jeopardy, upon whose case the Jury have not passed. The danger and peril of a
verdict do not relate to the verdict given. When the Jury are impanelled upon the trial of a
person, charged with a capital offence, and the indictment is not defective, his life is in peril or
jeopardy, and continues so throughout the trial."); O'Brian, 72 Ky. at 340-341 ("The word
jeopardy means exposure to death, loss, hazard, danger, peril, etc., and where one is put upon his
trial on a charge of murder before a jury sworn to decide the issue between the commonwealth
and himself the accused is then exposed to the hazard and peril of his life.").
56. 8 Tenn. at 279-280 (opinion of Crabb, J.).
57. Id. at 279.
58. Id. at 280.
59. Hoffman, 20 Md. at 432.
60. Cook, 6 Serg. & Rawle at 595-596 (opinion of Duncan, J.); Spier, 12 N.C. at 501-502
(opinion of Taylor, C.J.); Webb, 38 Cal. at 479.
61. Cook, 6 Serg. & Rawle at 597 (opinion of Duncan, J.).
62. Garrigues, 2 N.C. at 241; Mount, 14 Ohio at 303; O'Brian, 72 Ky. at 340.
63. Cook, 6 Serg. & Rawle at 598-599 (opinion of Duncan, J.)("amounted to an
acquittal"); Waterhouse, 8 Tenn. at 282 (opinion of Crabb, J.)("virtually acquitted", "tantamount
to an acquittal"); Mount, 14 Ohio at 302-303 ("operating as an acquittal", "equivalent to an
acquittal"); Webb, 38 Cal. at 478 ("equivalent to a verdict of acquittal"); Teat, 53 Miss. at 454
("will operate as an acquittal"); Maxwell, 11 Nev. at 437 ("equivalent to a verdict of acquittal").
64. Garrigues, 2 N.C. at 241 (jury should not be discharged "unless for the benefit of the
prisoner . . . or if the prisoner after the jury are charged with him, be found insane . . . or if at the
prisoner's request, a jury be withdrawn to let him in to take the benefit of an exception"); Cook, 6
Serg. & Rawle at 580 (opinion of Tilghman, C.J.)(discharge permitted upon necessity or in cases
of consent where the defendant is assisted by counsel); Waterhouse, 8 Tenn. at 282 (opinion of
Crabb, J.)(discharge allowed for necessity); Spier, 12 N.C. at 496 (opinion of Hall, J.)(discharge
permitted by necessity: an unforeseeable event or fundamentally defective indictment) and 497
(opinion of Taylor, C.J.)(discharge also permitted with the defendant's consent, if he was
represented by counsel); M'Kee (quoted in State v. Shirer, 20 S.C. 392, 405 (1884))(consent,
illness of a juror, prisoner, or judge, absence of a juror, impossibility of agreeing upon a verdict);
Mahala v. State, 18 Tenn. 532, 541-542 (1837)(consent and necessity); Mount, 14 Ohio at 302
(consent); Dobbins v. State, 14 Ohio St. 493, 500 (1863) (necessity); Morgan v. State, 13 Ind.
188, 189 (1859) (consent, unforeseen occurrences); Webb, 38 Cal. at 480 (consent, legal
necessity, cause beyond the control of the court); Teat, 53 Miss. at 454 (legal or physical
necessity); Maxwell, 11 Nev. at 434-435 (consent and necessity, including inability of a jury to
agree on a verdict).
65. Garrigues, 2 N.C. at 241 (jurors were required to "separate" because "they could not
agree to convict"); Cook, 6 Serg. & Rawle at 579 (jury had arrived at a verdict as to two prisoners
but not the third, but jury was discharged without a giving a verdict regarding any of the
prisoners); Mahala, 18 Tenn. at 541-542 (jury discharged during deliberations); Mount, 14 Ohio
at 306 (nolle prosequi after verdict on the ground that indictment was lost); Teat, 53 Miss. at 439
(verdict and sentence on wrong indictment). But see Spier, 12 N.C. at 494-495 (record did not
disclose why jury returned no verdict except for the fact that the term of court had expired).
66. Spier, 12 N.C. at 494 (opinion of Hall, J.); M'Kee (quoted in Shirer, 20 S.C. at 405);
Mount, 14 Ohio at 302-303; Morgan, 13 Ind. at 189; Webb, 38 Cal. at 478-479; Maxwell, 11
Nev. at 434-435.
67. See authorities in previous footnote.
68. 22 U.S. 579 (1824).
69. Id. at 580 (emphasis added).
70. Bretz, 437 U.S. at 35 n. 10.
71. See id. at 45 (Powell, J., dissenting)(admitting that 19th and 20th Century Supreme
Court cases following Perez were ambiguous).
72. 85 U.S. 163, 173-174, 174 n. 17 (1874).
73. Compare cases concluding that double jeopardy was not implicated: Wyatt, 1 Blackf.
at 257 n. 1; Fells, 36 Va. at 616; Price, 36 Miss. at 544; Hoffman, 20 Md. at 434; Shotwell, 27
Cal. at 399; O'Brian, 69 Ky. at 568; with cases concluding that double jeopardy was implicated:
Mahala, 18 Tenn. at 536; Dobbins, 14 Ohio St. at 500; Maxwell, 11 Nev. at 434.
74. Bishop on Criminal Law (see Morgan, 13 Ind. at 189 and Webb, 38 Cal. at 478 (citing
1 Bish. Crim. Law, §§657, 658, 660, 665); see also 1 Bish. Crim. Law, 9th ed., §§1014(5), 1015,
1018, 1019 (1923)(preface: first edition issued in 1856, renumbering occurred in third edition
issued in 1865, various editions including latest "do not differ in arrangement . . . nor change
materially the statements of legal doctrine")); United States v. Perez, 1 Leading Crim. Cases
357, 358-359 (Bennett & Heard 1857); Thomas M. Cooley, Cooley's Const. Limitations, 4th
ed., 404-406 (1878).
75. Bishop (9th ed.) at §1018, 1019 (language and consequences); Bennett & Heard at 359
(common law practice forbidding nolle prosequi after jury impaneled and sworn).
76. Ned v. State, 7 Port. 187 (Ala. 1838); Williams v. Commonwealth, 43 Va. 567 (1845);
Atkins v. State, 16 Ark. 568, 577, 579 (1855); Gruber v. State, 3 W. Va. 699, 701-704 (1869).
77. Nugent, 4 Stew. & P. 72, 1833 Ala. LEXIS 51, at 6, 11.
78. State v. Costello, 11 La. Ann. 283, 284-285 (1856).
79. State v. Hall, 9 N.J.L 256, 262-264 (1827).
80. Commonwealth v. Sholes, 95 Mass. 554, 556 (1866).
81. Rep. Tex. Const., Decl. Rts., §9 (1836).
82. Tex. Const., Art. I, §12 (1845)(new language in italics).
83. Tex. Const., Art. I, §12 (1861).
84. Tex. Const., Art. I, §12 (1866).
85. Tex. Const., Art. I, §12 (1869).
86. Tex. Const., Art. I, §14 (1876)(new language in italics).
87. Lee, 15 S.W.3d at 928 (Keasler, J., dissenting)(quoting from the 1856 Code of
Criminal Procedure)(emphasis added).
88. Id.
89. 33 Tex. 671 (1871).
90. Id. at 672.
91. Id.
92. Id. 673.
93. Id. at 672-673.
94. Id. at 673-674.
95. Id.
96. Id. at 674.
97. 35 Tex. 97 (1872).
98. Id. at 109.
99. Id.
100. Id.
101. Id. 
102. Id. at 110.
103. Id.
104. See Tex. Const., Art. V, §6 (1876).
105. 2 Tex. Ct. App. 228, 237-238 (1877).
106. Id. at 237.
107. Id. at 238.
108. Id. at 239.
109. Id. at 239-240 (emphasis added).
110. Id. at 240-241.
111. 3 Tex. Ct. App. 648, 649 (1878).
112. Id.; see also Parchman, 2 Tex. Ct. App. 228, 1877 Tex. Crim. App. LEXIS 116, at 8.
113. 17 Tex. Ct. App. 345 (1884).
114. Id. at 347-348.
115. Id. at 347.
116. Id.
117. Id.
118. Id. at 348.
119. Id. at 349.
120. Id.
121. Id. at 350.
122. Id.
123. Id. at 350-351.
124. Id. at 350 (quoting Cooley at 404).
125. Id.
126. Id. at 351.
127. Id.
128. Id. at 352.
129. Id. at 353.
130. Id.
131. Id.
132. Woodward v. State, 42 Tex. Crim. 188, 198 (1900).
133. In characterizing the "mistrial species" of double jeopardy jurisprudence as the
application of double jeopardy protection to the "premature termination of the first trial because
of mistrial," the State suggests that a trial can be prematurely terminated in ways other than a
mistrial. But by definition and common legal usage, a "mistrial" is merely a "trial which has
been terminated prior to its normal conclusion." Black's Law Dictionary, 5th ed., p. 903.
(1979). A mistrial may be declared "because of some extraordinary event (e.g. death of a juror,
or attorney), for prejudicial error that cannot be corrected at trial, or because of a deadlocked
jury." Id.
134. Compare Rep. Tex. Const., Decl. Rts., §6 (1836)("right to a speedy and public trial,
by an impartial jury") with U.S. Const., Amend. VI ("right to a speedy and public trial, by an
impartial jury"). 
135. 85 U.S. at 173.
136. See 921 S.W.2d at 697-700 (Court's opinion), 700-701 (Clinton, J., concurring), 701-702 (Baird, J., concurring), 702-703 (Maloney, J., concurring). Judge Maloney's concurring
opinion did quote the interpretive commentary in discussing whether the Texas double jeopardy
provision applied, at all, to the mistrial setting. Id. at 702-703. That is a separate matter, already
addressed in part III of this opinion. 
137. See various opinions cited in the preceding footnote.
138. Id.
139. 377 U.S. 463, 468 n. 3 (1964).
140. Id. at 464, 466.
141. Id. at 467-468.
142. Id. at 468 n. 3
143. Commonwealth ex. rel. Montgomery v. Myers, 422 Pa. 180, 191, 220 A.2d 859, 865,
cert. denied, 385 U.S. 963 (1966).
144. Id. at 190-191, 220 A.2d at 865.
145. 424 Pa. 555, 556-557, 227 A.2d 177, 178 (1967). Neither side objected to the hearing
being held after jeopardy had attached. Id. at 557, 227 A.2d at 178.
146. Id. at 557, 227 A.2d at 179.
147. Id. at 557, 227 A.2d at 178-179.
148. Id. at 560-561, 227 A.2d at 180-181. The Pennsylvania Supreme Court concluded
that the defendant could be tried for the lesser offense of second degree murder because
Pennsylvania's double jeopardy provision, containing the phrase "life or limb," applied only to
offenses carrying a possible punishment of death or dismemberment. Id. at 558-560, 227 A.2d at
179-180 (refusing to follow Ex parte Lange).
149. United States v. Jorn, 400 U.S. 470, 485 (1971)(opinion of Harlan, J.).
150. Id. at 485 n. 12.
151. United States v. Beasley, 479 F.2d 1124, 1126 (5th Cir.), cert. denied, 414 U.S. 924
(1973).
152. See State v. Ballinger, 504 P.2d 955, 959 (Ariz. App. 1973).
153. See State v. Manning, 224 N.W.2d 232, 235 (Iowa 1974); State v. Calhoun, 67 Wis.2d
204, 225, 226 N.W.2d 504, 514 (1975).
154. 424 U.S. 600 (1976).
155. Id. at 611.
156. Id. (brackets in Dinitz)(quoting Jorn, 400 U.S. at 485 and Downum v. United States,
372 U.S. 734, 736 (1963)).
157. Id. (emphasis added).
158. State v. Gwara, 311 Minn. 106, 108 (1976).
159. State v. Pulawa, 58 Haw. 377, 382, 569 P.2d 900, 905 (1977), cert. denied, 436 U.S.
925 (1978).
160. State v. Marquez, 113 Ariz. 540, 543, 558 P.2d 692, 695 (1976)("judicial or
prosecutorial overreaching intentionally calculated to force a mistrial")(emphasis in original);
State v. Baylor, 2 Kan. App. 2d 722, 725, 587 P.2d 343, 345 (1978); Commonwealth v. Potter,
478 Pa. 251, 266, 386 A.2d 918, 925 (1978)("misconduct designed to force the defendant to seek
a mistrial").
161. United States v. Crouch, 566 F.2d 1311, 1318 n. 9 (5th Cir. 1978).
162. United States v. Martin, 561 F.2d 135, 140 (8th Cir. 1977); State v. Baca, 193 Colo. 9,
14 n. 5, 562 P.2d 411, 414 n. 5 (1977); Chvojka v. State, 582 S.W.2d 828, 831 (Tex. Crim. App.
1979).
163. Kennedy, 456 U.S. at 674, 679. 
164. Id. at 674-679.
165. Crawford v. State, 703 S.W.2d 655, 662 (Tex. Crim. App. 1986).
166. State v. Kennedy, 295 Ore. 260, 666 P.2d 1316 (1983); Pool v. State, 139 Ariz. 98,
677 P.2d 261 (1984); Commonwealth v. Smith, 532 Pa. 177, 615 A.2d 321 (1992); Bauder
(1996); State v. Breit, 122 N.M. 655, 930 P.2d 792 (1996); State v. Rogan, 91 Haw. 405, 984
P.2d 1231 (1999); People v. Batts, 30 Cal. 4th 660, 68 P.3d 357 (2003), cert. denied, 540 U.S.
1185 (2004).
167. Smith, 532 Pa. at 186, 615 A.2d at 325 ("when the conduct of the prosecutor is
intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial");
Rogan, 91 Haw. at 423, 984 P.2d at1249 ("where, in the face of egregious prosecutorial
misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial").
168. Kennedy, 295 Ore. at 276, 666 P.2d at1326 ("when improper official conduct is so
prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official
knows that the conduct is improper and prejudicial and either intends or is indifferent to the
resulting mistrial or reversal"); Pool, 139 Ariz. at 108-109, 677 P.2d at 271-272 (prosecutorial
misconduct that "is not merely the result of legal error, negligence, mistake, or impropriety, but,
taken as a whole, amounts to intentional conduct that the prosecutor knows to be improper and
prejudicial, and which he pursues for any improper purpose with indifference to a significant
resulting danger of mistrial or reversal"); Bauder, see this opinion ante; Breit, 122 N.M. at 666,
930 P.2d at 803 ("wilful disregard" defined as "conscious and purposeful decision by the
prosecutor to dismiss any concern that his or her conduct may lead to a mistrial or reversal").
169. Batts, 30 Cal. 4th at 695-696, 68 P.3d at 380-381 ("when the prosecution, believing in
view of events that unfold during an ongoing trial that the defendant is likely to secure an
acquittal at that trial in the absence of misconduct, intentionally and knowingly commits
misconduct in order to thwart such an acquittal - and a court, reviewing the circumstances as of
the time of the misconduct, determines that from an objective perspective, the prosecutor's
misconduct in fact deprived the defendant of a reasonable prospect of an acquittal").
170. See Marquez and Potter, cited previously.
171. 456 U.S. at 673.
172. Dinitz, 424 U.S. at 609.
173. Id.; Kennedy, 456 U.S. at 676.
174. Bauder, 921 S.W.2d at 699.
175. Id. at 698 (emphasis added).
176. Batts, 30 Cal. 4th at 690 n. 23, 68 P.2d at 377 n. 23 (quoting Peter J. Henning,
Prosecutorial Misconduct and Constitutional Remedies, 77 Wash. U. L.Q. 713, 813 (1999)).
177. Potter, 478 Pa. at 266-267.
178. See Dinitz, 424 U.S. at 608 (defendant who chooses to request a mistrial may do so
because he has "little interest in completing" a "tainted" trial).
179. 921 S.W.2d at 699.
180. See Dinitz, 424 U.S. at 609 n. 10 (rejecting applicability of "knowing, intelligent, and
voluntary standard" of Johnson v. Zerbst, 304 U.S. 458 (1938), to the double jeopardy mistrial
context).
181. 921 S.W.2d at 699.
182. California has declined, thus far, to address the issue. Batts, 30 Cal. 4th at 665 n. 1, 68
P.3d at 360 n. 1.
183. Smith, 532 Pa. at 179, 615 A.2d at 322; Rogan, 91 Haw. at 408, 984 P.2d at 1234.
184. Breit, 122 N.M. at 658, 930 P.2d at 795.
185. State v. Jorgenson, 198 Ariz. 390, 10 P.3d 1177 (2000).
186. Kennedy, 295 Ore. at 276, 666 P.2d at 1326.
187. Ex parte Davis, 957 S.W.2d 9, 14-15 (Tex. Crim. App. 1997), cert. denied, 523 U.S.
1023 (1998); Ex parte Mitchell, 977 S.W.2d 575, 580-581 (Tex. Crim. App. 1997), cert. denied,
525 U.S. 873 (1998).
188. Davis, 957 S.W.2d at 11; see also Mitchell, 977 S.W.2d at 582 n. 2 (Meyers, J.,
concurring).
189. Kennedy, 456 U.S. at 674-675.
190. Id. at 675.
191. Bauder, 921 S.W.2d at 699.
192. Id. (emphasis added).
193. Compare Tex. Pen. Code §6.03(b)("a person acts knowingly . . . with respect to a
result of his conduct when he is aware that his conduct is reasonably certain" to cause the result)
with (c)("A person acts recklessly . . . with respect to . . . the result of his conduct when he is
aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will
occur")(emphasis added).
194. Bauder, 921 S.W.2d at 701 (Baird, J. concurring).
195. Id.
196. Warfield, supra; State v. Laster, 223 Mont. 152, 724 P.2d 721 (1986); People v.
Dawson, 431 Mich. 234, 427 N.W.2d 886 (1988); State v. Rademacher, 433 N.W.2d 754 (Iowa
1988); Beck v. State, 261 Ga. 826, 412 S.E.2d 530 (1992); State v. Long, 1993 Del. LEXIS 250
(1993); State v. Thomas, 275 Ga. 167, 562 S.E.2d 501 (2002). There may be others; we made no
effort to wade through the numerous trial and intermediate appellate opinions on the federal and
state level that have cited Oregon v. Kennedy. 
197. See authorities in previous footnote.
198. Warfield, 424 Pa. at 557, 227 A.2d at 178-179 (parties agreed that prosecutor intended
to cause a mistrial so that he could appeal the trial court's adverse ruling on a motion to suppress
after jeopardy had attached); Dawson, 431 Mich. at 258, 427 N.W.2d at 897-898 (counsel for the
state conceded during oral argument that prosecutor intended to cause a mistrial).
199. Laster, 223 Mont. at 154, 724 P.2d at 723; Rademacher, 433 N.W.2d at 757-758;
Beck, 261 Ga. at 826-827, 412 S.E.2d at 530-531; Long, 1993 Del. LEXIS 250, at 2; Thomas,
275 Ga. at 167, 562 S.E.2d at 502.
200. Warfield, 424 Pa. at 557, 227 A.2d at 178 (prosecutor's reference to confession in
opening statement after trial court ruled confession inadmissible); Laster, 223 Mont. at 154, 160,
724 P.2d at 723, 726 (trial court considered objective facts and circumstances of the case);
Dawson, 431 Mich. at 258-259, 427 N.W.2d at 898 (prosecutor's case was going badly because
inculpatory evidence was weak, complaining witness's testimony was inconsistent and
contradicted by so-called corroborating witness, and prosecutor was surprised by testimony of
another of his witnesses; prosecutor's request for a weekend recess was denied; prosecutor then
began asking several irrelevant questions, to which objections were sustained, and one
particularly prejudicial and improper question, which precipitated the mistrial; prosecutor neither
appeared surprised nor argued against the defendant's mistrial motion, but when asked whether
he had any response, he replied, "Nope."); Rademacher, 433 N.W.2d at 757-758, 759 (at one
stage of the proceedings, the prosecutor volunteered, "I'm probably going to lose this one
anyway"; prosecution's case was "at best . . . difficult"; prosecutor did not expect trial court's in
limine ruling regarding some testimony from a crucial state's witness, and after several
unsuccessful attempts to circumvent the in limine order, the prosecutor chose to violate the order
directly); Beck, 261 Ga. at 826, 412 S.E.2d at 530 (prosecutor violated order excluding
extraneous offenses; in granting mistrial, trial court found that the prosecutor had "a deliberate
intent to goad" defense counsel "into a mistrial"); Long, 1993 Del. LEXIS 250, at 2 (improper
questioning of a defense witness; after examining at length the prosecutor's conduct, the
proffered explanation for that conduct, and the state of the evidence, trial court found that the
prosecutor stood to gain a "clear advantage" on retrial and concluded that the prosecutor intended
to provoke a mistrial); Thomas, 275 Ga. at 167-168, 562 S.E.2d at 502-503 (the prosecutor "gave
inconsistent, unconvincing explanations as to why he posed the [mistrial-provoking] question to
the expert, . . . did not seek curative instructions, or assert that the trial should continue, . . . and
the prosecutor stood to gain by aborting the trial because the expert's testimony was favorable to
[the defendant]").
201. See State v. Ross, 32 S.W.3d 853 (Tex. Crim. App. 2000)(trial court ruling in
defendant's favor on motion to suppress can be upheld on the basis that the trial court may not
have believed the State's witnesses).
202. Manzi v. State, 88 S.W.3d 240, 244 (Tex. Crim. App. 2002)(quoting Anderson v.
Bessemer City, 470 U.S. 564 (1985))(omitting ellipsis and internal quotation marks).
203. Tex. Code Crim. Proc., Arts. 11.07, §2 & 11.08 (pre-trial application for writ of
habeas corpus), 27.03 (motion to dismiss indictment).
204. Tex. Code Crim. Proc., Arts. 27.05 & 27.07 (special plea of double jeopardy).
205. Malik v. State, 953 S.W.2d 234, 239 (Tex. Crim. App. 1997).
206. See Prystash v. State, 3 S.W.3d 522 (Tex. Crim. App. 1999), cert. denied, 529 U.S.
1102 (2000).
207. 921 S.W.2d at 699.
208. Peterson, 117 S.W.3d at 814.
209. Id. at 814-815.
210. 456 U.S. at 675; see also 456 U.S. at 679-680 (Powell, J., concurring).
211. See Tex. Pen. Code §6.03(c)("A person acts recklessly, or is reckless, with respect to
. . . the result of his conduct when he is aware of but consciously disregards a substantial and
unjustifiable risk that . . . the result will occur.").
212. Id. at 698-699.
213. Id. at 700.
214. Kennedy, 456 U.S. at 674; see also Bauder, 921 S.W.2d at 705 (McCormick, P.J.,
dissenting).
215. Bauder, 921 S.W.2d at 705 (McCormick, P.J., dissenting).
216. Kennedy, 456 U.S. at 676 ("Knowing that the granting of the defendant's motion for
mistrial would all but inevitably bring with it an attempt to bar a second trial on grounds of
double jeopardy, the judge presiding at the first trial might well be more loath to grant a
defendant's motion for mistrial."); see also Bauder, 921 S.W.2d at 704 (McCormick, P.J.,
dissenting).
217. Kennedy, 456 U.S. at 666-667, 666 n. 7; see also Bauder, 921 S.W.2d at 704
(McCormick, P.J., dissenting).
218. See Sorto v. State, 173 S.W.3d 469, 490 (Tex. Crim. App. 2005), cert. denied, 126 S.
Ct. 2982 (2006)("A trial court cannot grant a new trial as to punishment only. Even if appellant's
underlying claim of cruel and unusual punishment had been meritorious, that claim deals only
with the punishment stage. Therefore, a new trial on guilt or innocence would not have been the
appropriate vehicle by which to provide him relief.").
219. Bauder, 921 S.W.2d at 699.
220. Bauder v. State, 936 S.W.2d 19, 20 (Tex. App.-San Antonio 1996)(Bauder II).
221. Id. at 21-22.
222. Id. at 22.
223. Id. at 21 n. 3.
224. Ex parte Bauder, 974 S.W.2d 729, 731-732 (Tex. Crim. App. 1998)(Bauder III).
225. Id. at 732.
226. Id.
227. Id. at 732 (Baird, J., concurring).
228. Id. at 733-735 (Keller, J., dissenting).
229. Ex parte Bauder, 2 S.W.3d 376 (Tex. App.-San Antonio 1999)(Bauder IV).
230. Id. at 378.
231. Id. (internal quotation marks omitted).
232. Id. at 378 n. 1 ("But we presume from the reversal of our second opinion that neither
the necessity of the mistrial nor the efficacy of a judicial admonishment is dispositive. But see"
statements in Bauder and Bauder III.).
233. See id. at 378.
234. 971 S.W.2d 553 (Tex. App.-Dallas 1997).
235. Id. at 555.
236. Id. at 554.
237. Id. at 555.
238. Id. at 555 n. 5.
239. Id. at 556.
240. Id.
241. Id. at 557.
242. State v. Lee, 15 S.W.3d 921 (Tex. Crim. App. 2000).
243. Id. at 923-924.
244. Id. at 924.
245. Id. at 925.
246. Id. (quoting Bauder, 921 S.W.2d at 699)(numbering inserted for ease of reference, an
ellipsis omitted).
247. Id. (quoting Bauder)(numbering inserted, brackets omitted, some ellipses omitted).
248. Nos. 05-01-01093, 01286-CR, 2001 Tex. App. LEXIS 8407 (Tex. App.-Dallas,
December 20, 2001)(not designated for publication).
249. Id. at 1-4.
250. Id. at 4-5.
251. Id. at 6.
252. Id. at 13.
253. Id. at 10-11.
254. Id. at 12 (some brackets omitted, others inserted).
255. Peterson, 117 S.W.3d at 820.
256. Id. at 815.
257. Id. at 807.
258. Id. at 817 (emphasis added).
259. Id. at 818-819.
260. See id. at 817.
261. Id. at 829 (Hervey, J., dissenting).
262. Id. at 820 (Keasler, J., dissenting)(brackets omitted)(quoting State v. Lee, 15 S.W.3d
at 927)(Keasler, J., dissenting).
263. Id. at 825 (Hervey, J. dissenting).
264. Id. at 830.
265. State v. Michael J., 274 Conn. 321, 359, 875 A.2d 510, 534 (2005). The Connecticut
constitution does not contain an express prohibition against double jeopardy. 274 Conn. at 350,
875 A.2d at 528. The court nevertheless proceeded to analyze whether a standard more
protective than that articulated in Oregon v. Kennedy should be recognized in the double
jeopardy protection found to be implied in the state constitution's due process provision. 274
Conn. at 349-360, 875 A.2d at 528-535.
266. Batts, 30 Cal. 4th at 691-692, 68 P.3d at 378 (emphasis in original).
267. Id. (emphasis in original).
268. Ex parte Peterson, No. 05-01-01093-CR, 2004 Tex. App. LEXIS 1396 (Tex.
App.-Dallas, February 12, 2004)(not designated for publication).
269. See Ex parte Wheeler, 146 S.W.3d 238 (Tex. App.-Fort Worth 2004); Lewis, 165
S.W.3d 376.
270. State v. Masonheimer, 154 S.W.3d 247 (Tex. App.-Eastland 2005). 
271. Ex parte Wheeler, No. PD-1216-04 (Tex. Crim. App., October 4, 2006).
272. Ornelas v. United States, 517 U.S. 690, 697 (1996).
273. See Batts, 30 Cal. 4th at 696, 68 P.3d at 381 ("Kennedy . . . attached no similar
objective component to its standard").
274. See id. (A showing that "from an objective perspective, the prosecutor's conduct in
fact deprived the defendant of a reasonable or realistic prospect of acquittal" required as part of
the more expansive state constitutional standard to guard against a "windfall").